[Civ. No. 519.   Fifth Dist.   June 28, 1965.]

ROBERT G. BROWNLEE, Plaintiff and Respondent, v. ALFRED VANG et al., Defendants and Appellants.

466

William F. Reed and Carl Hoppe for Defendants and Appellants.

James W. Funsten for Plaintiff and Respondent.

BROWN (R. M.), J.—This is an appeal by the defendant-appellant from an adverse judgment rendered by the court in an action based upon the theory of fraud. By the judgment the plaintiff was awarded $4,500 as compensatory damages, $3,000 as exemplary damages, and his costs of suit. The action was brought against Alfred Vang, Ann Vang and Magnatron Corporation of America, Inc. The court found that no liability attached to Ann Vang. It was stipulated that, for the purpose of this lawsuit, the defendant Alfred Vang and the defendant Magnatron Corporation of America, Inc. are one. For convenience, the word "defendant" as herein used will be a reference to Alfred Vang.

The sole question presented by the appeal is whether the evidence supports the trial court's finding that the plaintiff relied upon the false representations made by the defendant and that such reliance was justified.

### The Facts

The plaintiff met the defendant, Alfred Vang, and the latter's wife, Ann Vang, in the latter part of 1947 or the early part of 1948 in Carmel, California. They became friends. At that time the plaintiff was a merchant seaman. He had recently married and was desirous of obtaining a shore job. Although he had attended the Colorado Junior College for three years and Hastings College of the Law for one year, he had neither training nor experience in engineering, science, or business. He had never made investments in stocks or bonds. His savings amounted to $4,000. The defendant told the plaintiff that he was an engineer and had studied at the University of Copenhagen; that he was an associate of Neils Bohr, a famous scientist, and had worked with Bohr on the Manhattan Project; that he had worked for the Federal Defense Department over a period of years and was called to Washington for

consultation from time to time; that he had designed and developed numerous electronic processes and items including the first automobile valve of the type still in use today; that he was a partner in the firm of Stevenson, Jordan and Harrison, one of the biggest of the research and development companies in the United States; that he owned and operated a factory in the east which was producing welding machines; that he had invented an electronic tube which General Electric and other leading manufacturers were very much interested in; that he had invented a panel which he used with the electronic tube the use of which was practically unlimited; that he had a contract with Electrical Products Company of Los Angeles to produce the panels; that he was developing a fog dispersion machine at the Monterey airport; and that he had developed a welding machine which was in production and was being sold in the east. In October 1948, the defendant told the plaintiff that he was negotiating for a plant on the Monterey peninsula for the purpose of putting his electronic tube into production and asked to borrow $6,000. He promised the plaintiff a position with him in his project. On October 23, 1948, the plaintiff loaned the defendant his savings of $4,000 and received a promissory note executed by the defendant promising to repay the sum with interest 60 days thereafter. He relied in part upon the representations of the defendant made directly to him, and in part upon an article which appeared in the October 13, 1947, issue of the Monterey Peninsula Herald, and information therein which originated with the defendant, which spoke in glowing terms of the defendant, his reputed background as an electronic inventor, and of a revolutionary invention which would disperse fog which the defendant was reportedly building and should have ready for testing about two weeks after the article appeared. The plaintiff also testified that he had seen the electronic tube and relied upon its functioning properly before he loaned the defendant the money. Shortly after the loan was made the defendant left the community and went to Berkeley. He failed to repay the loan. When the loan became due the plaintiff telephoned the defendant; the defendant reassured the plaintiff that everything was working out; that he had started a company with one George Hart. The plaintiff testified, "I felt he was a pretty important man and I didn't feel as though I wanted to badger him about the thing, and I felt that it was all right, that I would just—I would go along with

it more or less at his convenience, but I would like to have it back.'' The defendant also told the plaintiff that the panel was being used to drive a vibrator and that people from the University of California were very interested in the invention. About the middle of 1949, the plaintiff was told by George Hart that the defendant had left Berkeley and had removed to Vancouver, Canada. The plaintiff had several conversations with the defendant, who continually assured the plaintiff that his various enterprises were going well. He explained that George Hart had ''locked him out'' of the Berkeley plant and he had moved to Canada. He invited the plaintiff to come up to Canada and he would show the plaintiff what he was doing. On October 13, 1949, the plaintiff filed an action in the Superior Court of Monterey County in an attempt to collect on the note. Vang was never served. Subsequently the plaintiff asked Dun & Bradstreet to investigate what the defendant was doing in Canada. Dun & Bradstreet collected $500 on the note. The defendant asked the plaintiff to call off Dun & Bradstreet. In June of 1950 the plaintiff went to Canada and spent a ''couple'' of days with the defendant. The defendant showed him what they were doing, showed him drawings and parts of an electronic hammer, told him that he had a number of contracts for the equipment, told him that the defendant and one Eggleton had formed one company and were forming a second, gave a demonstration with the panel device, and suggested that he take stock in the companies in lieu of the amount of the debt. The plaintiff testified: ''I went up there pretty mad at Fred and I went away pretty happy with him. This appeared to me, from what he told me—the thing looked practical and looked as though his panels were a complete success.'' On some unspecified date between July 28, 1950, and March 5, 1951, the plaintiff cancelled the note in exchange for shares of stock in Magnatron Hammer Company, Ltd. and Magnatron Panel Company, Ltd., the two Canadian companies. The plaintiff returned for trips to Canada in 1951 and again in 1953, and attended shareholders' meetings. Although no dividends were paid on the stock, he received corporate financial statements showing that the companies were solvent. On some date between April 28, 1953, and January 13, 1954, the plaintiff purchased from one Joe Jordan further shares of stock in the two companies for $400. During the period from 1950 to 1955, the plaintiff also expended time and moneys in attending meetings in

Canada and preparing himself for the purpose of participating in projects of the defendant. At intervals during this period of time the defendant gave glowing progress accounts to the plaintiff and assured him that he would have a good position with the projects as soon as they got into production. The plaintiff testified: "Well, we were friendly, and then I felt unfriendly toward Fred; then we would get together, and it would be friendly again, and then it would continue to be that way." As late as 1960, just before this suit was filed, the defendant continued to reassure the plaintiff. In 1955 the plaintiff engaged the law firm of Lawrence, Shaw, McFarlane and Stewart to attend a shareholder's annual meeting and send him a report. The attorneys' report was unfavorable and suggested that stock in the defendant's companies was watered. The trial court found:

"I. Commencing in the year 1947 and continuing through the year 1955 defendant Alfred Vang represented to plaintiff that said defendant was a university educated electronics scientist with experience in electronics research and development and with professional associations with leading scientists. Continuously during said period, Alfred Vang represented to plaintiff that he, Alfred Vang, had perfected several different devices employing a unique electronics tube and circuit system developed by said Alfred Vang which devices were of great commercial value for immediate use in electroplating hard rock drill bits, aluminum smelting, industrial hammers, welding and other uses. Continuously during said period said Alfred Vang represented that he was able to, and intended to, make immediate commercial application of said devices and provide plaintiff employment in connection with said project.

"II. Continuously during said period of time there was a relation of personal trust and confidence between the plaintiff and the defendant Alfred Vang.

"III. Said representations were false. Said Alfred Vang did not have any university or college education. Said Alfred Vang did not have certain electronics research and development experience that he claimed to have. Said Alfred Vang did not have professional associations with leading scientists. Said Alfred Vang knew he was unable to, or had intention [sic] to, make commercial application of his devices and he never had any intention to provide employment for plaintiff. Said Alfred Vang made said representations

regarding said projects for the purpose of raising money for his use and to promote his own interests and without any intention to carry out the projects.

"IV. Said representations were made by said Alfred Vang with the intent to deceive plaintiff Robert G. Brownlee. Said plaintiff reasonably relied upon the said representations above set forth, and each of them, and in reliance thereon, gave Alfred Vang $4,000 of which $3,500 remains unreimbursed, and thereafter purchased worthless stock in reliance thereon at a cost of $400, and expended additional time and money for attendance at the corporation meetings of the projects of Alfred Vang and for preparation of himself to participate in the projects of said Alfred Vang, all to the damage of Robert G. Brownlee in the total sum of $4,500.

"V. Before June 27, 1955, said Robert G. Brownlee had neither discovered the fraud nor failed to exercise due diligence to discover the fraud. Before June 27, 1955, Robert G. Brownlee did not have the means of discovering the fraud and could not have discovered it in the exercise of due diligence. On said June 27, 1955, said Robert G. Brownlee must be deemed to have notice of said fraud on account of the continued failure of Alfred Vang to do what he said he intended to do and also on account of the letter received said day from Canadian attorneys stating suspicions of watered stock.

"VI.    .    .    .    .    .    .    .    .    .

"VII. The representations of said Alfred Vang were made as part of a continuous fraudulent and malicious course of conduct whereby he obtained money from numerous people as investments in projects which he never had any intention of carrying out."

### Argument and the Law

The defendant does not challenge the trial court's findings relating to the misrepresentations or damages. The only charge of error is that the trial court erred in finding that the plaintiff reasonably relied upon the representations of the defendant. It is claimed that the evidence is to the contrary. The plaintiff testified at length; the defendant did not testify and apparently was not present at the trial, but portions of a prior deposition which he had given were read into the record. That record is voluminous. The reporter's transcript embraces 813 pages; the clerk's, 254

pages; there are 179 interrogatories with answers; and more than 150 exhibits were received in evidence. From this vast record, the defendant has selected isolated items of evidence with which to persuade this court that the plaintiff, rather than relying upon representations of the defendant, took a calculated risk in the projects of the defendant in the hope of ultimate financial gain.

The defendant argues that, at the outset, the defendant promised to repay to the plaintiff the sum of $4,000 within 60 days; that he defaulted and left the community. The plaintiff testified that the first statement made by the defendant that he thought was false was the promise to pay the money, which promise was not kept; that the next statement was when the defendant told the plaintiff that the defendant was going to remain in the Monterey area, but did not do so and left the community; that he discovered the falsity of that statement in the fall of 1949. The plaintiff also testified that the defendant represented he was going to build a fog dispersal machine in Monterey, which he did not do. This the plaintiff learned in 1949. The plaintiff testified that he relied in part on the newspaper article that the fog dispersing machine would be ready for testing in late October 1949; but made no investigation to determine whether or not the machine had been completed. The plaintiff further testified that prior to the exchange of the note for the stock, he had a conversation with George Hart in San Francisco and Hart told the plaintiff that the defendant never finished any of his work. On July 4, 1949, the plaintiff wrote to the defendant and stated, in part, ". . . On October 23 of this year your 60 day note for the $4,000 loan I made you will be 10 months overdue." The defendant also points to the lawsuit which the plaintiff filed in Monterey County in an attempt to collect on the note, and the fact that he had Dun & Bradstreet investigate the defendant's activities in Canada and attempt collection. On March 31, 1950, the plaintiff wrote to the defendant stating in part: "Got your latest promise the other day through Dun and Bradstreet. If you have plans for skipping out of Canada without notice with the idea of raising a little money and losing me at the same time—don't do it."

When questioned concerning this letter, the plaintiff testified: "As far as keeping his promise to pay the money to me my confidence had dropped to a rather low ebb . . ." The defendant contends that the plaintiff's testimony summarized

above shows that he did not rely upon representations made by the defendant. Nevertheless, with knowledge of the many promises which had been unfulfilled, the plaintiff negotiated his first five shares of stock in Magnatron Hammer, Ltd. on July 25, 1950. About six months later, on January 5, 1951, the plaintiff complained by letter to the defendant, ". . . as you will recall, in 1948 when I made you the loan it was made with the understanding that I was to be given a chance to work for you." In a subsequent letter of February 8, 1951, the plaintiff admitted: ". . . When I suggested in my last letter that I was willing to take a final chance by accepting a transfer of stock I meant just that. I had no idea at that time, nor do I have any idea now, when you will get into production, or if you ever will."

Shortly after writing that letter and on March 5, 1951, the plaintiff obtained 15 shares in Magnatron Panel Company, Ltd., and 24 shares in Magnatron Hammer Company, Ltd., and cancelled the note.

In April 1953, the plaintiff purchased stock from Joe Jordan; at that time he knew that he had not received any dividends on the stock which he had acquired in 1950 and 1951. Also at this time he knew that there had been no commercial production in any of the defendant's ventures up to that date.

If the testimony on which the defendant relies was the sole evidence on the subject, it would be difficult to say that the plaintiff placed any reliance on the representations made by the defendant after the note was in default and the defendant had moved from the Monterey area. But it is not. The record is replete with testimony concerning telephone calls over the interval from 1949 through 1954 in which the defendant constantly explained difficulties he was encountering, soothed away the plaintiff's fears, gave glowing accounts of his various inventions, their marketability, desirability to manufacturers, and their potential worth. The defendant's wife, Ann Vang, wrote several letters to the plaintiff. One such letter, written on December 2, 1949, and authorized by the defendant, thanks the plaintiff for his patience; states that certain panels and electric hammers were being built to be shipped to California and would be in San Francisco no later than January 15th; that an attorney had been appointed to form a company for the immediate production of hammers; and that as soon as the hammers arrived in San Francisco the plaintiff could be paid in money or stock. The letter extolled the efficiency and low cost of

the hammers and their usefulness and salability. Mr. George Hart, who had been associated with the defendant in Berkeley, told the plaintiff that the equipment was good and that it would do the things the defendant claimed it would do. It was not until August 24, 1957, that the plaintiff learned for the first time that the electronic tube, which was claimed by the defendant to be a basis of his various inventions, did not work. It was not until after this suit was filed that plaintiff learned the hammer and panel were not inventions of the defendant. After 1957, plaintiff reached the conclusion that Vang's promises were made without the intention to perform, and this was after he had the opportunity of discovering that the defendant had a long history of promotional companies. Even as late as 1960, about a month before this suit was filed, the defendant again stated to the plaintiff that the projects in Canada were being successfully completed, and he furnished the plaintiff with what purported to be a financial statement and again attempted to allay the plaintiff's suspicions of fraud and assure him that defendant would protect his interests.

█ It is elementary that to make out a case of misrepresentation, the plaintiff must show not only a representation of a material fact upon which he was entitled to rely, but that he did in fact rely to his damage. (*Edwards* v. *Lang,* 198 Cal.App.2d 5 [18 Cal.Rptr. 60]; *Eck* v. *McMichael,* 176 Cal.App.2d 368 [1 Cal.Rptr. 369].) █ Whether or not fraud exists, including the element of reliance, is ordinarily a question of fact for the fact-finding entity.

█ As this court said in *Vogelsang* v. *Wolpert,* 227 Cal. App.2d 102, 110-111 [38 Cal.Rptr. 440]:

"Because of the diversity of factors and the differing intelligence of those guilty of fraud and their victims, the function of the trial judge in fraud cases is particularly significant. It is the duty of the judicial officer who sees and hears the witnesses to determine the weight and effect of their evidence; if there is any substantial showing of fraud the trial court must determine whether it outweighs the testimony presented by the opposing side; and his decision is ordinarily final in matters of this kind; appellate courts will not disturb a finding of fraud if there is any substantial evidence to support the lower court's decision. [Citations.]

"As a determination of the existence of fraud is particularly within the decisional field of the trial judge, the

474

appellants are attempting to swim upstream against a strong current of authority when they maintain that there was no such showing in the long record, and in effect that this court should pass again upon the factors which the trial court found to be indicative of fraud."

█ And at pages 111-112: "As is observed in *Feckenscher* v. *Gamble, supra,* 12 Cal.2d 482, 496-497 [85 P.2d 885]: ' "That plaintiff is too credulous is not generally a defense. 'The test of the representation is its actual effect on the particular mind, whether it is a strong and circumspect mind, or one weak and too relying.' " (*Neff* v. *Engler,* 205 Cal. 484, 489 [271 P. 744].)' "

Plaintiff points to the case of *Blackman* v. *Howes,* 82 Cal. App.2d 275, where the court, in considering the issue of justifiable reliance, said at pages 278-279 [185 P.2d 1019, 174 A.L.R. 1004]: "When the facts are susceptible to opposing inferences, whether a party relied upon a false representation, notwithstanding prior information which, if investigated, might have led to discovery of the falsity of the representation, is itself a question of fact to be determined by the trier of fact. [Citation.] Where one is justified in relying, and in fact does rely, upon false representations, his right of action is not destroyed because means of knowledge were open to him. In such a case, no duty in law is devolved upon him to employ such means of knowledge. [Citation.]

" 'The mere circumstance that one makes an independent investigation or consults with others does not necessarily show that he relied upon his own judgment rather than upon the representations of the other party, nor does it give rise to a presumption of law to that effect.' [Citation.] A buyer is not chargeable with knowledge of conditions which he fails to discover because of some deception of the seller. [Citations.] When, as here, the buyer has only a suspicion of fraud and the seller lulls the buyer into inaction by a false representation, the seller will not be permitted to assert that the buyer lost his rights by accepting the assurance of the seller that there was no fraud. [Citation.]"

In *Bank of America* v. *Greenbach,* 98 Cal.App.2d 220, at page 233 [219 P.2d 814], the court said: "It is, of course, the law that a party has a duty to investigate where he has notice of facts which indicate fraud. [Citations.] But this duty to investigate is a relative matter. The creditor has a legal right to rely upon the statements made by the debtor. If the debtor is guilty of deliberate fraud, it is not

good morals, nor does it make good sense or good law, to say that the creditor was too credulous because he placed too much reliance on the statements made by the fraudulent debtor, and is therefore barred.''

At page 234, the court said: ''It is also well settled that when a fact is peculiarly within the knowledge of the person making the representation and not within the knowledge of the person to whom it is made, the latter has the right to rely upon the representations of the former respecting such fact.''

The trial court found that during the period here involved there was a relation of personal trust and confidence between the plaintiff and the defendant, and that finding stands unquestioned.

In volume 23, California Jurisprudence, Second Edition, Fraud and Deceit, section 31, pages 75-76, it is said: ''A person has a right to rely on statements of material facts essentially connected with the substance of the transaction where there is a confidential relation existing between the parties, and such reliance cannot be charged as negligence. . . . A similar situation exists where one of the parties is ignorant and inexperienced in regard to the matters concerning which the material representations are made, and such ignorance is known to the other party, who is also aware that reliance is being placed on his representations and that the facts are not, and cannot be expected to be, within the first party's knowledge.''

The court, in *Bank of America* v. *Greenbach, supra,* 98 Cal.App.2d 220, said at page 235: '' [T]he question as to whether the known facts were sufficient to put the defrauded person on inquiry is one of fact for the trial court. . . . '. . . Whether or not the plaintiff was negligent in relying upon the truth of the defendant's representations seems to be immaterial. If under the facts, because of the relation of the parties, involving trust and confidence, or because the representor was in a position to know the facts which was definitely superior to that of the representee, or where an investigation by the representee could not be easily made, the courts hold that he was justified in relying on the truth of the false statements.' ''

In *Garrett* v. *Perry,* 53 Cal.2d 178 [346 P.2d 758], the issue of justifiable reliance on the part of the person defrauded was raised. Mr. Chief Justice Gibson, speaking for the Supreme Court, made brief disposition of the contention.

At pages 181-182, he stated: "The fact that a buyer makes an independent investigation does not preclude him from relying on representations made by the seller where, as here, the seller has a superior knowledge. [Citation.] Nor did the receipt of some unfavorable information preclude plaintiff from such reliance as a matter of law. [Citation.] The trial court could properly conclude that any suspicions of plaintiff arising from the information he had obtained upon his investigations were allayed by defendant's subsequent reassurances and that under the circumstances of this case plaintiff was not precluded from relying upon what defendant told him."

In volume 23 of California Jurisprudence, Second Edition, Fraud and Deceit, section 39, at page 97, it is said: ". . . , a party's suspicions may have been reasonably allayed by the other party's positive reassurances or representations."

In *Kalkruth* v. *Resort Properties, Ltd.*, 57 Cal.App.2d 146, at page 150 [134 P.2d 513], the court said: "We believe that when, as here, the buyer has only a suspicion of the fraud, and the seller who has defrauded the buyer, lulls the buyer into a sense of security by both words and conduct, the seller should not be permitted to assert that the buyer had lost his rights by waiving the suspicion and accepting the reassurance of the seller that no fraud had been perpetrated."

██ In this case the defendant purported to be an expert in the field of electronics; the plaintiff was ignorant concerning such matters. Through friendship a relation of trust and confidence existed between them. The misrepresentations made relative to a subject matter of which the plaintiff had no knowledge were not such that their falsity must have been so obvious to the plaintiff as to preclude any justifiable reliance thereon by him. Further representations, made as statements of fact and not of- opinion, dealing with contracts which the defendant had entered into with other firms, the potential production of and income from his claimed inventions, designed to allay the suspicions of the plaintiff, were themselves misrepresentations calculated to deceive. That they accomplished their purpose should not now redound to the benefit of the defendant. ██ It cannot be said that the plaintiff was more credulous than the average person would have been. The record shows that others invested in the projects and various corporations formed by the defendant and lost. It was said in the case of *Sanfran Co.* v. *Rees Blow Pipe Mfg. Co.*, 168 Cal.App.2d 191, at pages 202-203 [335 P.2d 995]:

"In *De Spirito* v. *Andrews,* 151 Cal.App.2d 126, the court said at page 130 [311 P.2d 173] :

" 'It is a general rule that a vendor not in a confidential relation to the buyer is not under a duty to make full disclosure concerning the object which he would sell. However, it is a universally recognized exception that if he undertakes to do so he is bound not only to tell the truth but he is equally obligated not to suppress or conceal facts within his knowledge which materially qualify those stated. If he speaks at all, he must make a complete and fair disclosure. [Citations.] '

"As pointed out in *Kuhn* v. *Gottfried,* 103 Cal.App.2d 80, 81 [229 P.2d 137], any facts which affect the desirability of the property to be sold, are facts 'which materially qualify these stated.' Defendant admitted that the double lines on the plot plan could be interpreted to mean walls.

". . . 'Where material facts are accessible to the vendor only and he knows them not to be within the reach of the diligent attention and observation of the vendee, the vendor is bound to disclose such facts to the vendee.' (*Rothstein* v. *Janss Investment Corp.,* 45 Cal.App.2d 64 [113 P.2d 465]; *Dyke* v. *Zaiser,* 80 Cal.App.2d 639 [182 P.2d 344].) . . .

". . . Whether the investigation made by the plaintiff was a properly full one after his discovery that the building was not Class 'C,' was an issue of fact for the trial court.''

The cases upon which the defendant relies are not in point. In the case of *Ruhl* v. *Mott,* 120 Cal. 668 [53 P. 304], the plaintiff entered upon the land, discovered the fraud, expressed dissatisfaction, and notwithstanding this knowledge, thereafter affirmed the contract by including the unpaid interest in a new note and giving the defendant a new mortgage upon the land. It was held that the second transaction was free from fraud and the plaintiff's conduct constituted a waiver of all rights of rescission. In *Gratz* v. *Schuler,* 25 Cal. App. 117 [142 P.899], the plaintiff purchased a panorama on defendant's representations that he could earn so much a day, and notwithstanding that after the plaintiff had operated the panorama for a few days to see what it was earning and thus knew the real earning capacity of the panorama, he completed the payment of the balance of the purchase price, and he could not be heard to say that he was deceived by the representations. In *Carpenter* v. *Hamilton,* 18 Cal.App.2d 69 [62 P.2d 1397], the plaintiffs, before parting with value, inspected a portion of the premises where there were patent defects contrary to representations which had been made by the

defendant. The reviewing court held that knowledge of the plaintiffs of the defendant's misrepresentations relating to the portion inspected, precluded reliance by them upon misrepresentations as to the condition of the premises which they did not visit. This case has never been overruled, but its broad language has been undercut by subsequent cases, such as *Sanfran Co.* v. *Rees Blow Pipe Mfg. Co., supra,* 168 Cal. App.2d 191, 203, and *Hefferan* v. *Freebairn,* 34 Cal.2d 715, 720 [214 P.2d 386], where its holding has been held applicable only to visible defects.

In the case before us the plaintiff was constantly reassured by the defendant, and under the circumstances he was not precluded from relying on what the defendant told him or showed him.

The defendant questions the sufficiency of the evidence to support the finding, but we think that the evidence is ample to support such, and will not belabor the well-settled law that this court is bound thereby. (*Overton* v. *Vita-Food Corp.,* 94 Cal.App.2d 367 [210 P.2d 757]; *Berniker* v. *Berniker,* 30 Cal.2d 439 [182 P.2d 557].)

The judgment is affirmed.

Conley, P. J., and Stone, J., concurred.