Filed 7/6/16  P. v. Ambito CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ARNOLFO B. AMBITO,<br><br>  Defendant and Appellant. | D067341<br><br><br>(Super. Ct. No. SCD225546) |

APPEAL from a judgment of the Superior Court of San Diego County, Peter I. Gallagher, Judge.  Affirmed as modified.

Sheila Quinlan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

In June and September 2005, defendant Arnolfo Ambito committed loan origination fraud by putting false information on three loan applications he submitted to

the victim of the offenses, Countrywide Home Loans. In a complaint first filed in February 2010, and subsequently by an amended information, Ambito was charged with three counts of grand theft of personal property (Pen. Code, § 487, subd. (a)),[1] and it was alleged he committed two or more related felonies, a material element of which was fraud and embezzlement, that involved a taking of more than $500,000 within the meaning of section 186.11. Finally, it was alleged that the earliest date the offenses could have been discovered for statute of limitations purposes was March 16, 2006, the date on which Ambito filed a declaration in San Diego County Superior Court admitting that he lied on his real estate loan applications. In Ambito's second trial,[2] the jury returned guilty verdicts on all counts, found the white collar crime enhancement true, and found the charges were timely filed.

On appeal, Ambito claims the charges were time-barred as a matter of law and the trial court therefore erred in denying his pretrial motion, made before commencement of his second trial, to dismiss the information. Ambito also argues the evidence was insufficient to support the jury's verdict finding the charges were timely filed. Ambito also contends, because the court elected to place him on court probation rather than formal probation, certain supervisory terms of his probation (conditions 6.b., 6.i., 6.j.,

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     In Ambito's first trial, the jury convicted him of the underlying counts and found the prosecution was timely but was unable to reach a verdict on the white collar crime enhancement. However, the court granted Ambito's motion for a new trial on all counts and allegations, which required a second trial.

6.k., and 6.*l*.) associated with formal probation should be stricken. The People concede, and we agree, that on remand those conditions requiring certain interactions between Ambito and a probation officer should be stricken.

I

FACTS

A. Prosecution Evidence

*The June 2005 Offenses*

On June 11, 2005, Ambito signed applications for two loans from Countrywide Home Loans (Countrywide) seeking a first mortgage of $400,000, and a home equity line of credit of $104,000, to purchase property located at 4548 Market Street in San Diego, California. The loans in question were "stated-income" loans. For this type of loan, Countrywide relied on the borrower's representation as to his or her income and, if the borrower was self-employed, Countrywide also required the applicant to provide a letter from a certified public accountant verifying self-employment (CPA letter).[3]

In the section of the application marked "employment information," Ambito listed his employment as "Ambito Trading" (and his job title as "owner" and "goods trading"), and he listed his business and home address as 271 C Street in Chula Vista. He listed his business phone number as (619) 744-9500, which was the number for the San Diego Police Department. Ambito's application stated he had been employed for five years five

---

[3]   Countrywide also required bank statements to verify the borrower had assets to make the down payment and closing costs, because funds for the down payment could not be borrowed, and credit reports showing other debt incurred by the borrower.

months with Ambito Trading, and the application listed his base employment income as $20,000 per month. In the section for "Assets and Liabilities" was a section entitled "Liabilities: alimony, child support, separate maintenance, payments owed to," and Ambito left that section blank. Ambito also answered "no" to another question specifically asking, "Are you obligated to pay alimony, child support or separate maintenance?"

A CPA letter was faxed to Countrywide on June 21, 2005. The name of the certified public accountant was Hamdan and Associates.[4] The CPA letter, which was undated, read: "To whom it may concern, this letter serves to confirm that Arnolfo Ambito has been self-employe[d] for the past three years in which I have been preparing his taxes."

Ambito's application was processed through CLUES, an automated underwriting system.[5] Countrywide concluded Ambito qualified for the requested loans. However, he

---

[4] Eroica Drugg, the branch operations manager, testified that, although the CPA letter did not list a phone number for the accountant, a phone number was not something Countrywide necessarily looked for from a CPA letter at that time, although it is now a requirement. However, Deborah Schwartz (an underwriter) indicated a CPA letter without a phone number or ability to verify the author was a certified public accountant is "considered a red flag," although it is unclear from her testimony whether it was considered a red flag in 2005 because Schwartz also testified the CPA letter in this case was "typical" of ones seen during that time period and Countrywide's policy was to trust a CPA letter and to not conduct additional investigation into its reliability. Drugg also testified that, although the letter was faxed to Countrywide by someone other than Hamdan and Associates, that was not unusual because Countrywide typically received the CPA letter from either the borrower or the loan originator.

[5] After the information contained in the application was obtained from Ambito, it was input into a computer processing system known as EDGE, and the applications were

would not have qualified if his income was substantially less, if he owed child support payments, or if he was using an unsecured credit card advance to pay a portion of the down payment.

Schwartz reviewed the documentation to make sure it complied with federal regulations, and with internal policies and procedures. She testified she had no reason to question the accuracy of the $20,000 base income as stated by Ambito. She testified the CPA letter in Ambito's file was typical of ones seen during that time period, and it was Countrywide's policy to trust a CPA letter that verified the borrower was self-employed and to not conduct additional investigation into its reliability or accuracy.

Once Schwartz approved the loan, the file was sent to Julie Soares, a loan processor, to assemble the conditions. Soares was responsible for comparing the information in EDGE to Ambito's credit reports, to see if there were any red flags. She completed a quality verification and documentation questionnaire (QVDQ), which was used to detect possible fraud, and the computer program did not detect any red flags. She also filled out a fraud prevention addendum, and again the program did not find anything that appeared to be wrong. Had Soares seen anything fraudulent, she would have

---

then transferred to the operations division to collect documentation and paperwork. Drugg obtained certain bank statements from Ambito. They consisted of an ING Direct statement showing a balance of $51,000, a USAA statement showing a balance of $17,000, and an AIG retirement plan through the City of San Diego in the amount of $79,000.

reported it. There was nothing in Ambito's application that would have caused Soares to hesitate or that suggested she should speak to a supervisor.[6]

The accuracy of representations in the loan application were crucial to Countrywide's decision as to whether to approve it. Countrywide used this information to determine the borrower's ability to repay the loan and would not have funded Ambito's loans had it known his income was actually only $7,000 per month, or known that Ambito had a $1,000 per month child support obligation, or known he funded the down payment using unsecured debt. In truth, Ambito's actual income was approximately $7,000 per month (from his job as a police officer), and he actually owed over $1,000 per month in child support obligations.[7]

On cross-examination, Countrywide employees acknowledged there were flaws or irregularities in the procedures used when processing and funding Ambito's loan. For instance, the applications included a section entitled "employment re-verification." No

---

[6] When the loans obtained final approval, Kaela Tamp, a funder, was responsible for making sure the closing documents were signed and for sending the funds to escrow. She used a checklist and compared that against the materials in the file. This included making sure Ambito had a CPA letter; however, her duties did not include verifying the letter's contents or reviewing it for accuracy. Although she did not recall Ambito's particular loan, Tamp's custom and practice was to use directory assistance or the Internet to determine whether a self-employed person's business existed.

[7] Countrywide also would not have funded the loan had it been aware Ambito funded the down payment using unsecured debt. It appears that at least a portion of the money he used to pay the down payment and closing costs may have originated from cash advances on his credit cards (unsecured debt) because he had obtained a cash advance (on a credit card) of $20,000 around the time of the June 2005 loan from Countrywide.

6

more than three days before the loan was to close, the approving underwriter or loan specialist was supposed to verify the employer's phone number. The file for Ambito's loan indicated Tamp called directory assistance. However, had Tamp contacted directory assistance, she would have learned the number belonged to Ambito's employer (the San Diego Police Department) rather than to "Ambito Trading."[8] Also, although the fax transmission sheet on Ambito's CPA letter was dated June 21, Tamp's notations indicated she reviewed it on June 14 when it should have been in the file. The CPA letter should have been dated, because the absence of a date prevents the lender from determining whether the information in the letter might be stale. Countrywide personnel also indicated a stated income in a large round dollar amount could raise a red flag.

*The September Offense*

In August 2005 Ambito again approached Countrywide for a loan, albeit at a different branch office. Ambito sought a loan of $433,600 to purchase investment property located at 2761-65 G Street. The primary driver for this kind of loan was the buyer's credit score; if the borrower's credit score was good enough, and the borrower's claimed income seemed reasonable and employment was verified, a borrower would qualify for the loan absent other disqualifying factors. A borrower did not need to list all of his or her employers as long as there was sufficient income from those he did list.

Ambito had a phone interview with Tim Treibach, a sales consultant. While they were on the phone, Ambito told Treibach that he had obtained another loan from

---

8    However, Schwartz also testified the fact a borrower has other employment not listed on the loan application would not necessarily raise a red flag.

Countrywide a few months earlier, and asked Treibach to pull up that application to make things easier by using that application to fill out parts of the new application. Treibach pulled up Ambito's June loan applications to re-verify the employment and asset information and use the prior information. Ambito confirmed he worked at Ambito Trading, but seemed surprised that his income from Ambito Trading was listed as $20,000 per month. Ambito claimed he had worked for Ambito Trading since 2000 and earned $7,000 per month from that company, and that he was also a police officer with a monthly salary from that job of approximately $7,000, and had been so employed for over 22 years.

Treibach believed Ambito Trading was an extant business for which Ambito worked because Ambito had previously provided the CPA letter and the previous loans had closed. Treibach did advise Ambito an underwriter might question the differences in income on his application, because of the substantial decrease in monthly income, but he also told Ambito there might not be any questions raised because Ambito was claiming a decrease in income, which was not as noteworthy as a borrower's claim that his stated income had substantially increased would have been. Treibach did not investigate the drop in stated income from $20,000 to $14,000 because he did not suspect fraud, since Ambito's stated income was lower than it had been, and it appeared there was actually a business called Ambito Trading.

Treibach also relied on Ambito's previous applications when filling out the information on whether Ambito owed alimony, child support, or separate maintenance. Treibach also obtained updated credit reports and bank statements to ascertain Ambito's

8

liabilities and assets, and entered the information anew into the EDGE system. Ambito signed the application along with closing documents on September 19, 2005.

Janice Cameron was the underwriter for the loan. Cameron received training on how to detect fraudulent loan applications and was encouraged to report fraud if she detected it. A failure to report could result in the loss of her job. Countrywide had to rely on borrowers' honesty because it is impossible to confirm the accuracy of every box checked on every loan application. Cameron testified that, in the case of child support and other similar obligations, it would be against the law to ask the recipient; nor did they go to the courthouse and see if there were pending cases involving the borrower. Like Schwartz, Cameron completed a QVDQ to ensure she had not missed anything. There were no red flags or alerts. The application indicated that someone had called "Teresa" in the police department's human resources division and she confirmed Ambito was employed there. Ambito's loan was approved. It would not have been approved if his income was lower, he had additional debt, or he used unsecured borrowed funds to make any portion of the down payment.

As with the June 2005 loans, Countrywide employees acknowledged there were flaws or mistakes made in connection with processing and funding Ambito's September 2005 loan. For example, Cameron testified that Treibach did not inform her of the decline in stated income between Ambito's two loan applications and, had he done so, she would have taken some undefined action.[9] Additionally, if one application lists one

---

[9]     Cameron testified that, if a first application lists an income of $20,000 from one source and the borrower then tells the salesperson (in connection with a second

employer and the second lists another, this could be a red flag, but there is no problem adding a second employer.[10]  Cameron also testified she would expect a CPA letter to have a date on it, but letters without phone numbers were not uncommon.

*Discovery of the Fraud*

Ambito was involved in legal proceedings regarding child support following his divorce.  In 2006, in connection with those proceedings, Ambito's ex-wife apparently became aware of his income claims on his home loan applications and asked the family court to impute to Ambito the income listed on the loan applications.  Ambito filed a written response with the court stating, in pertinent part:

> "I worked with a loan broker who prepared these documents for me. She insisted that the false incomes stated were necessary in order for me to qualify for these loans.  She made . . . me believe that this was not unusual in these transactions and I shouldn't worry about it. . . . Obviously, the income stated on these applications [is] completely untrue.  My only income is from salary as a San Diego police officer.  I still sell occasional coins, but at no profit. . . .  While I am not happy that I am again being called a liar, I own up to it as far as the applications are concerned."

The FBI opened its investigation of Ambito concerning mortgage fraud in November 2007.  By March 2009 the FBI was aware of the family court filing by Ambito

---

application) that the income from that source was only $7000, it raises a suspicion of fraud that should be reported, and it was a mistake for Treibach not to report that discrepancy.

10     Indeed, Cameron testified that a loan originator who notices discrepancies between a current application and a prior loan application would not be obligated to immediately bring it to the attention of a supervisor, but instead should reinterview the borrower about the discrepancy to obtain an explanation, and there is no problem if the borrower needs to add the income from a second employer to qualify for the loan.

admitting he had lied on the loan applications. Subsequent investigation could locate no CPA firm entitled Hamdan and Associates.[11]

In February 2010, FBI special agent Terry Reed interviewed Ambito. Ambito claimed he used a broker to prepare the applications, who told him just to sign the blank application documents and the broker would fill them in, and told him not to worry and that no one would verify his income.[12] He admitted the information concerning his income from Ambito Trading was significantly overstated, and explained the omission of his child support obligation by stating he understood from the broker that "since it's not on your pay stub [as an itemized deduction] [¶] . . . [¶] [w]hy even declare it? See . . . if nobody knows about it-- [¶] . . . [¶] then why put it on there? . . . [¶] . . . [¶] [I]f nobody needs to know about it, and it makes you look better, why . . . ?"

B. Defense Evidence

The defense theory of the case rested primarily on the claim the offenses should reasonably have been discovered prior to February 14, 2006, and therefore the action against Ambito was time-barred. A defense expert reviewed the loan files for each of the three loans that are the subject of this case. He testified the CPA letter in this case,

_____

11    A forensic accountant investigated how Ambito obtained the funds for the down payments on the properties. His tracing efforts revealed Ambito had used credit card advances to generate cash deposits into his accounts from which the down payments on the two properties were made.

12    During the interview, Ambito told the FBI agent that he would provide the name, address and phone number of the loan broker he spoke with who helped him prepare the loan applications, but still had not provided that information by the time of trial.

because it was undated, listed no phone number for the accountant, had misspellings, and was faxed to Countrywide by a third-party rather than from the certified public accountant himself, should have raised a number of red flags. Given the state of the letter, Countrywide should have contacted the accountant and, if the accountant could not be found, Countrywide should have disregarded the letter. The required actions in light of the red flags would have put Countrywide on notice of the possibility that a crime had occurred.

He also testified the reported income drop from the earlier Market Street property loans to the later G Street property loan also should have raised a suspicion by Treibach, and he should have asked Ambito to explain it. Treibach had the duty to report the disparity because it meant fraud may have occurred, and any indication of possible fraud requires reporting.

II

LEGAL FRAMEWORK

Ambito raises two claims on appeal: the evidence was insufficient to support the jury's verdict finding that the charges were not time-barred, and the trial court erred in denying his pretrial motion to dismiss the information on the grounds the action was time-barred. We first synopsize the substantive rules concerning the running of the statute of limitations before turning to the standard of review governing our assessment of Ambito's claims on appeal.

A. <u>Statute of Limitations and Delayed Accrual</u>

The statute of limitations for fraud-based offenses is four years "after discovery of the commission of the offense . . . ."  (§ 801.5; § 803, subd. (c).)  Although *actual* discovery will commence the limitations period, the courts have also read a requirement of reasonable diligence into the limitations statute.  (*People v. Zamora* (1976) 18 Cal.3d 538, 561 (*Zamora*) [noting that discovery provision "has . . . been interpreted to include the same requirement of 'reasonable diligence' in discovering the facts of a theft that the courts have read into the 'discovery' provision of the statute of limitations for tort actions based on fraud as set forth in Code of Civil Procedure section 338, subdivision 4"].)  As explained by the court in *People v. Petronella* (2013) 218 Cal.App.4th 945, 956-957:

> "In applying the discovery requirement, '[L]ack of actual knowledge is not required to bring the "discovery" provision . . . into play.  The crucial determination is whether law enforcement authorities or the victim had actual notice of circumstances sufficient to make them suspicious of fraud thereby leading them to make inquiries which might have revealed the fraud.'  [(Quoting *Zamora, supra*, 18 Cal.3d at pp. 571-572, italics omitted.)]  'However, discovery of a loss by the victim *alone* is insufficient to trigger the running of the limitations period: "Literally, . . . discovery of a loss, without discovery of a criminal agency, is not enough."  [Citation.]' [(Quoting *People v. Soni* (2005) 134 Cal.App.4th 1510, 1518.)]  'The question is whether there is sufficient knowledge that a crime has been committed.'  (*People v. Crossman* (1989) 210 Cal.App.3d 476, 481 . . . .)"

Although "discovery" for purposes of the commencement of the limitations period requires only constructive knowledge, a victim has not constructively discovered the offense if the facts " 'would have only created a suspicion of wrongdoing.' "  (*People v. Crossman, supra,* 210 Cal.App.3d at p. 481.)  "[I]t is the discovery of the crime, and not

13

just a loss, that triggers the running of the statute." (*People v. Lopez* (1997) 52 Cal.App.4th 233, 246, fn. 4 (*Lopez*); *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 334 ["[f]or the purposes of triggering the statute of limitations under a similar tolling statute, a discovery was held not to have occurred even though officials learned substantial facts which would have only created a suspicion of wrongdoing"], disapproved on other grounds in *People v. Whitmer* (2014) 59 Cal.4th 733, 742.) Moreover, even when facts are sufficient to arouse suspicion in a reasonable victim, subsequent reassurances by the defendant may operate to reasonably allay concerns and delay the discovery of the fraud. (See. e.g., *Garrett v. Perry* (1959) 53 Cal.2d 178, 181-182 [trial court could reasonably find that plaintiff's suspicions "were allayed by defendant's subsequent reassurances"]; accord, *Brownlee v. Vang* (1965) 235 Cal.App.2d 465, 476 [defendant's "[f]urther representations . . . , designed to allay the suspicions of the plaintiff, were themselves misrepresentations calculated to deceive. That they accomplished their purpose should not now redound to the benefit of the defendant."]; see also *Hartong v. Partake, Inc.* (1968) 266 Cal.App.2d 942, 966.)

Thus, the time when the statute of limitations commenced to run is an intensely factual determination and, at a minimum, requires an evaluation of when the discoverer[13]

---

[13] For purposes of the discovery provisions, the defendant in *People v. Wong* (2010) 186 Cal.App.4th 1433 (*Wong*) argued that when "a defendant embezzles from a private entity, *any* subordinate employee qualifies as a victim who can be charged with notice." (*Id*. at p. 1445, italics added.) Rejecting that argument, *Wong* concluded it would follow the analysis of *Lopez*, which held that "in cases involving fiscal crimes against government, a victim for purposes of the discovery provisions . . . is a public employee occupying a supervisorial position who has the responsibility to oversee the fiscal affairs of the governmental entity and thus has a legal duty to report a suspected crime to law

acquired knowledge of facts that would be " ' "sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry." ' " (*Lopez, supra,* 52 Cal.App.4th at p. 246.)  The courts have generally concluded that the issue of when the victim or law enforcement either actually learned of defendant's fraud, or, alternatively, when through the exercise of reasonable diligence the victim or law enforcement could have discovered the fraud, presents questions for the jury to decide.[14] (*People v. Petronella, supra,* 218 Cal.App.4th at p. 957; *Zamora, supra*, 18 Cal.3d at p. 562 ["Once the court determines that the facts stated in the pleadings are sufficient and do not show, as a matter of law, that in the exercise of reasonable diligence the plaintiff could have discovered the fraud at an earlier time then the reasonable diligence question becomes an issue for the trier of fact."].)

B. Analysis of Standard of Review

We consider what standard of review applies to Ambito's claims.  It is clear Ambito's primary claim—there was insufficient evidence to support the jury's verdict finding the charges were not time-barred—requires that we must affirm the judgment if

---

enforcement authorities." (*Lopez, supra*, 52 Cal.App.4th at pp. 247-248, fn. omitted.) *Wong* applied that same rationale to private entities who were victims (*Wong,* at p. 1445), and we adopt that approach in this case.

[14]    The same approach is employed in civil cases involving fraud.  (See, e.g., *Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 61 ["The question when a plaintiff actually discovered or reasonably should have discovered the facts for purposes of the delayed discovery rule is a question of fact unless the evidence can support only one reasonable conclusion."]; *Enfield v. Hunt* (1979) 91 Cal.App.3d 417, 419-420 [in delayed discovery cases, "whether the plaintiff exercised reasonable diligence is a question of fact for the court or jury to decide.  The drastic remedy of summary judgment may not be granted unless reasonable minds can draw only one conclusion from the evidence."].)

substantial evidence supports the jury's determination. (*Wong, supra,* 186 Cal.App.4th at p. 1444 ["the substantial evidence test applies when we are asked to review the record to determine whether a jury properly found, by a preponderance of the evidence, that a criminal proceeding is timely under the statute of limitations"]; accord, *People v. Castillo* (2008) 168 Cal.App.4th 364, 369 ["When an issue involving the statute of limitations has been tried, we review the record to determine whether substantial evidence supports the findings of the trier of fact."].)

However, Ambito asserts de novo review applies to his claim the trial court erred when it denied his pretrial motion to dismiss. He recognizes that, in a pretrial motion to dismiss based on a theory of a statute of limitations defense, the defendant bears the burden of proving as a matter of law that the statute of limitations has run (*Lopez, supra,* 52 Cal.App.4th at p. 251), and if the evidence on the issue is conflicting, the court should deny the motion and leave the issue to the jury. (*Id*. at p. 250, citing *Zamora, supra*, 18 Cal.3d at pp. 563-564, fn. 25.) However, Ambito asserts that his motion to dismiss was based on the facts concerning "discovery," which were adduced during the first trial and therefore rested on "undisputed" facts. Relying on dicta from *Sahadi v. Scheaffer* (2007) 155 Cal.App.4th 704,[15] he argues that when the relevant facts are not in dispute, the

---

[15] In *Sahadi*, the court recognized that "[q]uestions concerning whether an action is barred by the applicable statute of limitations are typically questions of fact" but went on to state that "when 'the relevant facts are not in dispute, the application of the statute of limitations may be decided as a question of law. [Citation.]' " (*Sahadi v. Scheaffer, supra,* 155 Cal.App.4th at p. 713.) Although *Sahadi* does briefly mention the role the "discovery" rules have in triggering a statute of limitations (*id*. at p. 715), the de novo review applied in *Sahadi* was *not* de novo review of the trial court's determination of the time the plaintiff knew or should have known of the wrongdoing. Instead, *Sahadi* applied

16

application of the statute of limitations may be decided as a question of law, and therefore this court is not bound by the trial court's decision but must instead conduct de novo review of the ruling.

We believe the standard of review we should apply when examining the propriety of the trial court's ruling on Ambito's motion to dismiss should turn on the substance of that motion. We conclude his motion to dismiss on limitations grounds was, when shorn of its trappings, a motion to dismiss under section 1118.1. Specifically, the argument he asserted in the motion to dismiss relied entirely on the evidentiary showing made during his first trial on the merits to argue the prosecution could not meet its burden of showing the action was timely filed, and hence was the functional equivalent of a motion pursuant to section 1118.1. Our conclusion is reinforced by the fact that Ambito's motion to dismiss merely reiterated (and indeed incorporated by reference) the exact facts and arguments raised in his companion motion (made explicitly under § 1118.1) that a judgment of acquittal was required because the evidence adduced at his first trial was insufficient to satisfy the prosecution's burden of showing the action was timely filed.

Because we conclude Ambito's "motion to dismiss" was functionally equivalent to, or a repackaged version of, his companion motion filed pursuant to section 1118.1, we believe we must apply the standards of review ordinarily applicable to rulings on section

de novo review to the interpretation of the distinct legal question of when the plaintiff suffered "actual injury" (*ibid.* [noting it was the "second element of actual injury—which is the element in controversy here"]), and ultimately concluded on de novo review that the trial court had misconstrued when the plaintiffs had suffered actual injury. (*Id*. at pp. 727-734.) Thus, any implication by *Sahadi* that de novo review is equally applicable to questions of "discovery" would be dicta.

17

1118.1 motions to our assessment of Ambito's claim of error as to his motion to dismiss. When determining whether the evidence was sufficient to support the trial court's denial of a section 1118.1 motion, the standard of review is essentially the same as used when evaluating whether the evidence was sufficient to sustain a conviction on the charged offenses. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) Under that standard, we " 'do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] . . . "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' " (*Ibid*.)

Because we employ the same standards for assessing both Ambito's claim that the evidence was insufficient to support the jury's verdict finding that the charges were not time-barred and his claim the trial court erred in denying his pretrial motion to dismiss the information based on the time bar, we believe our conclusion on the former claim will necessarily subsume the latter. Accordingly, we evaluate whether the evidence, viewed in the light most favorable to the judgment and drawing all reasonable inferences in favor thereof, supports the jury's determination that the action was filed within four years of when the victim or authorities reasonably should have known of Ambito's fraud.

18

ANALYSIS

A. <u>Substantial Evidence Supports the Verdict</u>

Ambito, relying principally on *Zamora, supra*, 18 Cal.3d 538, argues the evidence was insufficient to support the jury's determination that the action was timely commenced. He asserts the evidence compelled the conclusion that, prior to February 15, 2006,[16] Countrywide's supervisorial personnel actually knew facts that would have made a reasonably prudent person sufficiently suspicious to have prompted further inquiry and that inquiry would have revealed (prior to February 15, 2006) Ambito had committed fraud in his loan applications.

Ambito makes no claim that the evidence was insufficient to support the jury's implied finding that Countrywide's supervisorial personnel had no reason to know or suspect, prior to February 15, 2006, that Ambito had falsely denied having child support obligations. Instead, he argues the fact the first loans contained an undated CPA letter was a red flag that should have placed Countrywide's supervisorial personnel on notice that he was providing false information concerning his monthly income and should have prompted additional investigation. However, Schwartz (the underwriter who reviewed the first loans and described the absence of a date as a "red flag") also testified the CPA letter in Ambito's file was *typical* of ones seen during that time period, that it was Countrywide's policy to trust a CPA letter that verified the borrower was self-employed and to *not* conduct additional investigation into its reliability or accuracy, and that the *reason* an undated CPA letter raises issues (which she described as "slight implications")

---

16      The parties stipulated the criminal action was filed on February 15, 2010.

was that the absence of a date prevents the lender from determining whether the information in the letter might be outdated.[17] A trier of fact could conclude, based on this evidence, that the fact a CPA letter might contain stale information was a minor imperfection that, when compared to all of the other information (the fact that a check of Ambito's credit reports, the QVDQ and fraud prevention addendum did not detect any red flags) would not have made a reasonably prudent person sufficiently suspicious to have prompted further inquiry into whether Ambito had committed fraud in his loan applications.[18] Substantial evidence supports the jury's determination the criminal proceeding was timely under the statute of limitations. (*Wong, supra,* 186 Cal.App.4th at p. 1444; *People v. Castillo, supra,* 168 Cal.App.4th at p. 369.)

Ambito also argues his revelations to Treibach (in connection with his September 2005 loan application) demonstrates the evidence was insufficient to support the jury's

---

[17] Ambito also appears to contend that the fact the CPA letter had no phone number on it was a suspicious circumstance warranting additional investigation. However, a trier of fact could have credited Drugg's testimony that not all CPA letters had phone numbers on them, and the presence of a phone number was not "one of the main points . . . we looked for."

[18] Ambito also points out that another flaw was the phone number listed for Ambito Trading, which should have been checked by Tamp to verify Ambito Trading was a legitimate business, was actually the phone number for the San Diego Police Department, and Tamp conceded she could have made a mistake in not checking. However, there was no suggestion Countrywide's supervisorial personnel were aware of Tamp's error (much less that they were aware the listed phone number was *not* associated with Ambito Trading), and we cannot conclude as a matter of law that Countrywide's *supervisorial* personnel were aware of facts requiring further inquiry. (*Lopez, supra*, 52 Cal.App.4th at pp. 247-248; accord, *People v. Moore* (2009) 176 Cal.App.4th 687, 695 [even where person with actual knowledge of fraud has duty "to refer suspected fraud 'up the chain of command,' " time is not triggered until facts become known to victim of fraud].)

implied determination that, prior to February 15, 2006, Countrywide's supervisorial personnel did not actually know facts that would have made a reasonably prudent person sufficiently suspicious to have prompted further inquiry. Ambito argues that, once he told Treibach the amount listed as income from Ambito Trading (on his earlier applications) was wrong and was only $7000 per month, and told Treibach he was also a police officer earning approximately $7000 per month from that job, this provided "red flags" Treibach should have reported to supervisorial personnel, which should have prompted further investigation prior to February 15, 2006. However, Ambito cites nothing to suggest *Treibach* qualified as a "victim" under controlling authority (cf. *Wong, supra,* 186 Cal.App.4th at p. 1445 [where employee embezzles funds, facts known by subordinate employees but unknown to supervisorial personnel does not trigger limitations period]), and he cites no evidence suggesting anyone other than Treibach knew of his revelations. Moreover, Ambito reassured Treibach that he in fact worked at Ambito Trading (and apparently indicated he had worked there since 2000,) earned $7,000 per month from Ambito Trading and another $7,000 as a police officer, and was only surprised that his income from the former was listed as $20,000 a month. Treibach did not investigate or report the drop in stated income from $20,000 to $14,000 because he did not suspect fraud, since Ambito's stated income was lower than it had been, and it appeared there was actually a business called Ambito Trading. A jury could infer that a reasonable person's suspicions would have been allayed by Ambito's assurances that he was a person of presumably reputable character (as a long-standing member of the police force) and his explanation that, although his total income did exceed $14,000, there was a

21

mistake attributing $20,000 per month to Ambito Trading.  (See, e.g., *Garrett v. Perry, supra,* 53 Cal.2d at pp. 181-182; *Brownlee v. Vang, supra,* 235 Cal.App.2d at p. 476.)

Ambito argues that, as in *Zamora, supra*, 18 Cal.3d 538, the "crucial determination is whether law enforcement authorities or the victim had actual notice *of circumstances sufficient to make them suspicious of fraud thereby leading them to make inquiries which might have revealed the fraud*" (*id.* at pp. 571-572) and this court should conclude, as did *Zamora*, "the uncontradicted evidence . . . compels the conclusion that a prudent man apprised of the information known in 1968 would have pursued a more vigorous inquiry." (*Id.* at p. 572.)  However, *Zamora* merely held that, under the specific facts of that case, "there is not substantial evidence to support the jury's implied findings that reasonable diligence was exercised to discover the fraud . . . ." (*Id.* at p. 573.)  We are unconvinced by Ambito's efforts to bring himself within *Zamora's* holding, for two reasons.  First, when an appellate court must "decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.)

More importantly, the facts in *Zamora* involved vastly different circumstances.  In *Zamora*, the authorities *knew* (within days after a building was set ablaze) that a crime *had* been committed; and all of the relevant evidence strongly indicated a Mr. Hanak was the arsonist. (*Zamora, supra,* 18 Cal.3d at pp. 566-568.)  However, the investigator mentioned (in a discussion with a deputy district attorney) that Hanak "had no apparent motive and questioned whether he should investigate the possibility of an insurance fraud. When he received no encouragement he terminated this line of investigation." (*Id.*

22

at p. 569.) The investigation was allowed to lapse, even though other investigators learned the defendant *was* connected to the burned property (and had been experiencing financial difficulties) and that a witness might be able to connect Hanak to people associated with the defendant. (*Id.* at pp. 571-573.) On that record, *Zamora* was "unable to conclude that there is substantial evidence to support" the jury's finding the action was not time-barred because the "evidence produced at trial shows that with the exercise of reasonable diligence the facts constituting the acts of grand theft could have been discovered at an earlier time."[19] (*Zamora, supra,* 18 Cal.3d at pp. 565-566.) In contrast to *Zamora*, in which the authorities knew *some* crime had been committed, but simply failed to investigate and hence remained unaware of the full extent of the offenses and the identities of all those involved, there is no suggestion Countrywide knew *any* crime had been committed that would call for a more thorough investigation. Although the facts presented below would permit a trier of fact to conclude Countrywide imperfectly

_____

[19]     The phrasing of *Zamora's* holding—that "the facts constituting the acts of grand theft could have been discovered *at an earlier time*"—presents some logical conundrums for the lower courts, because *Zamora* neither identified the "earlier" date on which the facts constituting the acts of grand theft should have been discovered nor provided guidance on how lower courts should proceed when determining that earlier date as a matter of law in future cases. Specifically, the statute begins to run when the victim or law enforcement knows of, or should have discovered, *the offense*. (See, e.g., *People v. Bell* (1996) 45 Cal.App.4th 1030, 1061.) Thus, it appears the determinative date is *not* merely the date on which there were circumstances sufficient to trigger further investigation, but is instead when the fraud should have been *discovered* had those inquiries been diligently pursued. *Zamora's* statement that, in the exercise of reasonable diligence, the facts constituting the acts of grand theft could have been discovered "at an earlier time" leaves entirely undefined the date of that "earlier time" and (by leaving undefined the date on which the statute of limitations began running) necessarily provided no date on which the statute of limitations expired.

23

processed or scrutinized Ambito's applications, that does not necessarily compel the conclusion Countrywide should have known a crime had been committed. We conclude substantial evidence supports the jury's determination the criminal proceeding here was timely under the statute of limitations.

B. The Trial Court Properly Denied Ambito's Pretrial Motion

As previously discussed, we believe Ambito's "motion to dismiss" was the functional equivalent of a motion for acquittal under section 1118.1. A trial court correctly denies a motion under section 1118.1 where there is substantial evidence that, if credited, would support a guilty verdict. (*People v. Harris* (2008) 43 Cal.4th 1269, 1286 ["On a motion for judgment of acquittal under section 1118.1, the trial court applies the same standard as an appellate court reviewing the sufficiency of the evidence. The court must consider whether there is any substantial evidence of the existence of each element of the offense charged, sufficient for a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt."].) For the reasons we previously discussed, there is substantial evidence to support the jury's determination the criminal proceeding here was timely under the statute of limitations, and we therefore conclude the trial court correctly denied Ambito's motion to dismiss.

DISPOSITION

On remand, the trial court shall amend defendant's probation terms to reflect that the court placed defendant on court probation rather than formal probation and that probation conditions 6.b, 6.i, 6.j, 6.k and 6.*l* be stricken.  As so modified, the judgment is affirmed.


McDONALD, J.

WE CONCUR:


BENKE, Acting P. J.


AARON, J.