Filed 9/23/16  Gomez v. Bank of America CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MARIA DE LOS ANGELES AURORA GOMEZ et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BANK OF AMERICA, N.A., et al., <br><br> Defendants and Respondents. | B261092 <br><br> (Los Angeles County <br> Super. Ct. No. BC533686) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly E. Kendig, Judge.  Affirmed in part, reversed in part.

Thomas K. Bourke for Plaintiffs and Appellants.

Reed Smith, Peter J. Kennedy, Mathew Wrenshall, Dennis Peter Maio and Paul D. Fogel, for Defendants and Respondents.

## INTRODUCTION

Plaintiffs and appellants are 19 individuals who invested and lost money in a Ponzi scheme created by disgraced mortgage broker Kaveh Vahedi. About half of them secured the funds to invest in the Ponzi scheme by taking out mortgage loans from Countrywide Bank, FSB and Countrywide Home Loans, Inc., brokered by Vahedi. Plaintiffs sued defendants and respondents Bank of America, N.A., as successor in interest, Countrywide Bank, FSB, and Countrywide Home Loans, Inc., (collectively, defendants[1]), alleging that defendants and Vahedi engaged in a "two-prong" conspiracy: assisting Vahedi in his Ponzi scheme and placing plaintiffs into fraudulent mortgage loans they could not afford, resulting in substantial losses once the scheme collapsed and Vahedi ceased covering payments on the unfavorable loans. The trial court twice sustained defendants' demurrers on multiple grounds, ultimately denying leave to amend as to all claims. Plaintiffs appeal the dismissal of their complaint. We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL HISTORY

### I. Factual Allegations

The following facts are alleged in plaintiffs' first and second amended complaints. Countrywide Home Loans, Inc. (CHL) originated residential home mortgage loans. Countrywide Bank, FSB (Countrywide Bank) was a "federally-chartered, savings bank" that funded loans originated by CHL. In 2008, Bank of America "merged" with both Countrywide Bank and CHL, "acquiring substantially all of their assets," and therefore is their successor in liability.

CHL operated by using a "nationwide network of over 30,000 mortgage brokers." CHL purportedly controlled these brokers through "at-will Wholesale Broker Agreements" and marketed the brokers to loan applicants and borrowers as "carefully screened" business partners. One of CHL's "business partners" was Vahedi, who

---

[1] Plaintiffs also sued several individuals, Vahedi's family members and employees, none of whom are parties to this appeal. Therefore, we refer to the entity defendants collectively as "defendants" herein.

performed mortgage broker services through his corporation, KGV Investments, Inc. (KGV). KGV also used the name "Countywide Financial," which plaintiffs allege Vahedi deliberately chose to suggest an affiliation with the Countrywide entities. Vahedi was licensed as a real estate broker in 1995, but his license expired in March of 1999. However, he continued to work with CHL as a mortgage broker until August 2009.

Plaintiffs allege that defendants and Vahedi conspired to "take advantage" of "unsophisticated consumers" through a scheme involving "two interrelated and inextricably intertwined aspects . . . : (1) a mortgage-fraud aspect, and (2) a Ponzi-loan aspect." The scheme involved a three-step process. First, Vahedi would "seduce and charm his victims," many of whom were longtime friends or clients, through exorbitant displays of wealth[2] and claims of his business prowess and "ability to get large loans, primarily from Countrywide." Next, in the Ponzi-loan portion of the scheme, he would offer his victims a "lucrative, but highly confidential deal" whereby they would invest in Vahedi's various businesses around the world. Vahedi told plaintiffs these investments were "risk-free" and that he would guarantee the repayment of their principal, payable at any time upon demand, as well as an additional return, paid in monthly installments.

Finally, Vahedi "would arrange for Plaintiffs to raise the money to invest by taking out cash-out Home Equity Loans of Credit (HELOCs) on their homes." During the loan application process, Vahedi and other KGV employees would inflate income, asset, and employment information without plaintiffs' knowledge, in order to obtain the largest possible loan amount. Vahedi promised plaintiffs that the large monthly mortgage loan payments would be amply covered by the returns on their investments with him.

In all, between 2005 and 2008, defendants funded "loans with over $6 million of cash-out proceeds to Ponzi-loan victims," including 10 of the plaintiffs here. The remaining plaintiffs, using other sources of funding, also loaned millions of dollars to Vahedi as part of his Ponzi scheme. Vahedi kept the scheme afloat through 2008 by

---

[2] Plaintiffs allege Vahedi's wealth came in part from commissions he had made on earlier mortgage loans and in part from the proceeds of loans in the early part of the Ponzi scheme.

3

making many payments to Ponzi investors and by sending "lulling emails" with various excuses for nonpayment. In the fall of 2008, "when Vahedi's scheme began to implode, he fabricated a phony IRS letter" to explain why his payments had stopped. The letter stated that over $500 million of his assets was frozen in Switzerland as a result of an IRS investigation into a multi-million dollar business deal.

In November 2012, Vahedi pled guilty in federal court to bank fraud and other felonies, admitting to knowingly making "false statements on at least 250 loan applications" submitted to defendants and other lenders and to defrauding over 30 "investor victims" out of more than $8 million in Ponzi loans. In December 2013, Vahedi was sentenced to 18 years in prison.

Plaintiffs alleged that defendants played a role in the Vahedi scheme by "turn[ing] a blind eye" to over 250 fraudulent mortgage loan applications submitted by KGV and Vahedi between 1999 and 2008, and further failing to follow proper underwriting procedures, such as checking fraud reports, confirming the status of Vahedi's broker license, and verifying borrower documentation, all of which allowed Vahedi to continue his misconduct unabated. Defendants also promoted and "vouched" for Vahedi and KVG as a trusted "business partner," a relationship plaintiffs allege they relied on when deciding to invest with Vahedi.

As a result of the scheme, plaintiffs lost millions of dollars in Ponzi loans that Vahedi never repaid. In addition, many plaintiffs were saddled with loans they could not afford and could not refinance due to the fabricated information on their original applications.

## II.    Federal Action

In October 2012, 17 of the same plaintiffs filed a federal lawsuit against defendants and others, asserting both federal and state claims arising out of Vahedi's mortgage loan and Ponzi scheme. Following a motion to dismiss, an amended complaint, and a second motion to dismiss, the district court dismissed the federal claims with prejudice and declined to exercise supplemental jurisdiction over the state claims. The

4

Ninth Circuit affirmed that decision in March 2016. (*Gomez v. Bank of Am.*, No. 14-55129, 2016 WL 807367 (Mar. 2, 2016).

## III. State Action

Plaintiffs filed the instant action in Los Angeles County Superior Court on January 17, 2014. To remedy a "technical problem," they filed a first amended complaint (FAC) a few days later. Therein, 10 plaintiffs (the borrower plaintiffs) alleged that they had obtained mortgages from Countrywide and used proceeds from those loans to invest with Vahedi—Maria and Elias Gomez, Vachik Alvandi, Evelin Raft, Robert and Heather Ferguson, Douglas and Sharon Marks, and Roberta and Ronald Barteck.[3] The remaining nine plaintiffs (the non-borrower plaintiffs) invested with Vahedi using other funding sources—Fred Shokoufi, Leesha Keller, Tadeh and Idet Keshmeshian, Celaris Zadorian, Herayr Zahrabi, Sharon and Shelley Reuveni, and David Valentino.[4]

The FAC alleged nine causes of action against defendants and several individuals: (1) fraud, (2) unfair business practices and false advertising, (3) breach of fiduciary duty, (4) negligence, (5) negligent misrepresentation, (6) elder and dependent adult abuse, (7) a claim asserting violation of "property and privacy" rights under the California Constitution, (8) identity theft, and (9) breach of contract.

Defendants demurred to the FAC. Defendants argued that plaintiffs failed to allege facts sufficient to establish liability or causation by defendants. They further asserted that plaintiffs' claims were barred by the applicable statutes of limitations and that each cause of action failed to state a claim. Plaintiffs opposed, pointing in particular to their allegations regarding defendants' statements about KGV and Vahedi as trusted "business partners," defendants' failure to monitor Vahedi's conduct or catch numerous

---

[3] As discussed further below, although the Bartecks have been consistently included by both parties in the group of borrower plaintiffs, they allege that they obtained a mortgage loan from defendants brokered by Vahedi, but used other funds for their investment in Vahedi's Ponzi scheme.

[4] Although the allegations in the FAC are inconsistent on this point, it appears that Keller and Shokoufi applied for Countrywide loans, but ultimately did not obtain them. Thus, both parties and the trial court included them in the group of non-borrower plaintiffs.

5

"red flags" in the mortgage loan documents, and defendants' purported activity that removed them from the role of a traditional lender and increased the duties they owed to plaintiffs. Both parties sought judicial notice of materials including Vahedi's criminal plea agreement, the federal court's rulings dismissing the federal complaint, and other trial court rulings on separate lawsuits brought by other Vahedi investors.

The trial court sustained the demurrer, finding that the plaintiffs failed to allege sufficient facts to establish liability by defendants based on theories of conspiracy or agency, failed to establish causation, and failed to adequately allege facts that would toll the statutes of limitations. The court further found that each of plaintiffs' causes of action was inadequately pled. Plaintiffs were granted leave to amend as to the borrower plaintiffs only. As to the non-borrower plaintiffs, the court found that they "failed to make any showing that they could cure" the defects in the FAC.

The borrower plaintiffs filed a second amended complaint (SAC) in September 2014, omitting the claims for constitutional violations and identity theft, and reasserting the remaining seven claims. The SAC encompassed more than 200 pages, including a 66 page appendix providing "additional factual detail as to who, what, when, where, and how of the fraud, breach of fiduciary duty, conspiracy, and aiding and abetting."[5]

Defendants again demurred. The trial court sustained the demurrer, this time without leave to amend as to all remaining claims. The court found that "neither the pleading nor the arguments for and against the demurrer have changed" and therefore "essentially the same problems" were present in the SAC. In particular, the court concluded that "plaintiffs fail to allege that anything Countrywide did caused their damages from Vahedi's Ponzi scheme, and fail to adequately allege facts that would make Countrywide liable under agency, aiding and abetting, and conspiracy theories."

---

[5] Oddly, despite the considerable length of the SAC, only the "appendix" contains the allegations with the necessary factual detail to support plaintiffs' claims. The SAC itself is a jumble of conclusory allegations, frequently repeated, and page after page of improper legal argument. Particularly given the repetition and extraneous matter, the size of this pleading is unnecessary and increases the burden on opposing counsel and the court.

As to the statutes of limitations, the court rejected plaintiffs' argument that they were entitled to tolling based on delayed discovery, as the SAC lacked any facts demonstrating "when any particular plaintiff discovered his or her injury, or why or how that plaintiff was unable to discover that the loan payments were unaffordable, or the fraud associated with Vahedi's Ponzi scheme, earlier (that is, when loan repayment began in 2008 or when Vahedi stopped making payments on the Ponzi scheme between 9/14/2008 and 1/16/2009)." The court further sustained the demurrer as to each cause of action.

The court entered a judgment of dismissal in favor of defendants and against all plaintiffs. Plaintiffs timely appealed.

## DISCUSSION

### I.      Standard of Review

We independently review the trial court's ruling sustaining a demurrer to determine de novo whether the complaint alleges facts sufficient to state a cause of action. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) We "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] Further, we treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law. [Citations.]" (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.) We also consider judicially noticed matters in determining whether the complaint states facts sufficient to constitute a cause of action. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.]" (*Aubry v. Tri–City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967.)

We review an order denying leave to amend by determining "whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of

7

discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.)

## II. Defendants' Liability

Vahedi was undisputedly the central actor in the schemes that injured plaintiffs. As a result, plaintiffs' claims are largely premised on holding defendants vicariously liable for Vahedi's conduct based on theories of conspiracy, partnership/agency, and aiding and abetting. The trial court rejected all of these theories as to all plaintiffs and further found that the SAC did not adequately allege causation. We disagree in part. Assuming the truth of plaintiffs' allegations, as we must at this stage, we conclude that the borrower plaintiffs have adequately alleged agency liability as well as causation in the SAC. On the other hand, the non-borrower plaintiffs, who proceed only under a conspiracy theory, have not alleged any facts in the FAC (the operative pleading as to them) connecting defendants' conduct to their claims. We therefore affirm the trial court's order sustaining the demurrer to the FAC as to the non-borrower plaintiffs in its entirety.

### A. *Conspiracy*

The FAC and SAC are replete with references to a conspiracy between defendants and Vahedi to "target[] unsophisticated consumers for financial gain by fraudulent means," specifically, through the "interrelated and inextricably intertwined" mortgage loan and Ponzi loan aspects of Vahedi's scheme. To adequately allege civil conspiracy, a complaint must state: (1) the formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the resulting damage. (*Wise v. Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 64-65, disapproved on other grounds by *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511.) Civil conspiracy is not an independent tort; rather, it is a "legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.]" Thus, proof of a conspiratorial agreement requires proof of "knowledge on the part of the alleged conspirators of its unlawful objective and their intent to aid in achieving that

8

objective." (*Schick v. Lerner* (1987) 193 Cal.App.3d 1321, 1327; see also *Michael R. v. Jeffrey B.* (1984) 158 Cal.App.3d 1059, 1069 ["mere knowledge, acquiescence, or approval of an act, without cooperation or agreement to cooperate is insufficient to establish liability"]; *Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 784-786 (*Wyatt*) [conspiracy requires agreement to commit tortious scheme and "knowledge of its unlawful purpose"].)

While knowledge and intent ""may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances"" (*Wyatt, supra*, 24 Cal.3d at p. 785), "'[c]onspiracies cannot be established by suspicions. . . . Mere association does not make a conspiracy.'" (*Davis v. Superior Court* (1959) 175 Cal.App.2d 8, 23.) Rather, a plaintiff pleading conspiracy must allege facts showing "some participation or interest in the commission of the offense." (*Ibid.*)

Plaintiffs here do not allege facts demonstrating defendants' knowledge of, or intent to aid in, Vahedi's Ponzi scheme to steal large amounts of money from his investors. Indeed, while they argue that defendants benefited from the scheme with respect to the borrower plaintiffs—because Vahedi used some of the proceeds to make early loan payments and because the loans generated commissions and fees—they do not attempt to explain how or why defendants would become involved in such a scheme with respect to non-borrowers. Instead, plaintiffs claim that defendants "probably" knew of Vahedi's scheme and turned a blind eye toward his conduct. But the factual allegations in the SAC regarding defendants' knowledge and implied agreement relate, at best, to Vahedi's submission of fraudulent mortgage applications. The SAC does not allege facts supporting the purported overarching conspiracy to take those loan proceeds from the borrower plaintiffs and use them to invest in Vahedi's Ponzi scheme. The allegations in the FAC are deficient for the same reasons as to the non-borrower plaintiffs.

The inability to sufficiently plead conspiracy is fatal to the claims alleged by the non-borrower plaintiffs. Plaintiffs' counsel acknowledged during argument on the demurrer to the FAC that the non-borrower plaintiffs were proceeding only on a

9

conspiracy theory. Counsel's concession underscores the gap between defendants' alleged conduct and the non-borrower plaintiffs. Without the portion of the scheme related to mortgage loan fraud, these plaintiffs allege no basis to connect defendants to their injuries from Vahedi's Ponzi scheme.[6] Therefore, we conclude none of the plaintiffs have sufficiently alleged a conspiracy between defendants and Vahedi as a basis for their claims. With respect to the non-borrower plaintiffs, we affirm the trial court's judgment in favor of defendants on this ground.

**B.** *Agency*

Plaintiffs assert several arguments regarding the nature of the relationship between defendant and Vahedi, including actual and ostensible agency and partnership. Plaintiffs

---

[6] At oral argument, plaintiffs' counsel claimed that the non-borrower plaintiffs' claims were also viable under an aiding and abetting theory. But the infirmities in plaintiffs' allegations regarding defendants' knowledge and participation apply here as well. (See, e.g., *Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1325-1326 [aiding and abetting liability requires actual knowledge and substantial assistance in the tortious activity].) Further, we are not persuaded by the four federal cases plaintiffs' cite, all of which allowed aiding and abetting allegations to proceed, but under distinguishable factual circumstances. (See *Arreola v. Bank of America, Nat. Ass'n* (C.D.Cal. Oct. 5, 2012, No. CV 11-06237) 2012 WL 4757904, at *1 [bank manager admitted accepting bribes to facilitate Ponzi scheme and bank provided "suspicious" services to fraudster, including wiring large sums of money to his personal accounts in Mexico]; *Benson v. JPMorgan Chase Bank, N.A.* (N.D.Cal. April 15, 2010, Nos. C-09-5292, C-09-5560) 2010 WL 1526394, at *3-4 [alleging bank's knowledge where face of investor's checks demonstrated fraud, investor funds commingled and wired to offshore bank accounts]; *Gonzales v. Lloyds TSB Bank, PLC* (C.D.Cal. 2006) 532 F.Supp.2d 1200, 1204, 1207 [bank knew of commingling of investors' funds and the moving of millions of dollars into and out of the fraudster's accounts, and bank's senior manager acknowledged he was "nervous" but continued to assist in fraud]; *Neilson v. Union Bank of California, N.A.* (C.D.Cal. 2003) 290 F.Supp.2d 1101, 1120 [allowing claim for aiding and abetting where complaint alleged bank actively participated in Ponzi scheme with actual knowledge of crimes, including by transferring money from investors' accounts into Ponzi account and "utiliz[ing] atypical banking procedures" to service fraudster's account].) In particular, we note that the discussion of "atypical" banking procedures in *Neilson*, upon which plaintiffs rely, involves procedures by the defendant bank that were different than those the bank *concurrently* used with other customers. (See *Neilson*, *supra*, 290 F.Supp.2d at p. 1120.) Here, on the other hand, plaintiffs allege defendants' procedures were "atypical" in that they were not those of a "traditional" lender.

10

acknowledge that ordinarily, a mortgage broker acts as the agent for the borrower, not the lender. (See, e.g., *Wyatt, supra*, 24 Cal.3d at p. 782 ["A mortgage loan broker is customarily retained by a borrower to act as the borrower's agent in negotiating an acceptable loan."].) However, they contend that on these facts Vahedi was acting as a dual agent for both plaintiff borrowers and defendants. Because we conclude that plaintiffs have sufficiently alleged facts supporting ostensible agency, we need not reach the remaining alternative arguments. (See *Aubry v. Tri–City Hospital Dist., supra,* 2 Cal.4th at pp. 966–967 [error to sustain demurrer when plaintiff has stated a cause of action under any possible legal theory].)

"An agent is one who represents another, called the principal, in dealings with third persons." (Civ. Code, § 2295.) "'In California agency is either actual or ostensible. (Civ. Code, § 2298.) An agency is actual when the agent is really employed by the principal. (Civ. Code, § 2299.) An agency is ostensible when a principal causes a third person to believe another to be his agent, who is really not employed by him. (Civ. Code, § 2300.) [¶] An agent has the authority that the principal, actually or ostensibly, confers upon him. (Civ. Code, § 2315.). . . . Ostensible authority . . . is the authority of the agent which the principal causes or allows a third person to believe that the agent possesses. (Civ. Code, § 2317.)' [Citation.]" (*J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388, 403.) Recovery against the principal for the acts of an ostensible agent requires proof of three elements: "The person dealing with an agent must do so with a reasonable belief in the agent's authority, such belief must be generated by some act or neglect by the principal sought to be charged and the person relying on the agent's apparent authority must not be negligent in holding that belief. [Citations.]" (*Id.* at pp. 403-404.) "Ostensible agency cannot be established by the representations or conduct of the purported agent; the statements or acts of the principal must be such as to cause the belief the agency exists. [Citations.]" (*Id.* at p. 404.) "'Liability of the principal for the acts of an ostensible agent rests on the doctrine of "estoppel," the essential elements of which are representations made by the principal, justifiable reliance by a third party, and a change of position from such reliance resulting in injury. [Citation.]' [Citation.]"

11

(*Kaplan v. Coldwell Banker Residential Affiliates, Inc*. (1997) 59 Cal.App.4th 741, 747 (*Kaplan*).)

Whether ostensible agency exists "'. . . is a question of fact . . . and may be implied from circumstances. [Citations.]'" (*Kaplan, supra*, 59 Cal.App.4th at p. 748.) In *Kaplan*, for example, the plaintiff filed an action for real estate fraud against his broker, who independently owned and operated a Coldwell Banker franchise. (*Id*. at p. 743.) Pursuant to the requirements of the franchise agreement, the broker included in his advertising a disclaimer that his franchise was independently owned and operated, but in much smaller print than he used in other parts of the document that touted his relationship with Coldwell Banker. (*Id*. at p. 744.) In opposing summary judgment, the plaintiff presented evidence that he "'went for the sign,' did not notice the disclaimer language, and trusted Coldwell Banker, a large reputable company with a national existence." (*Ibid*.) The court of appeal found that a triable issue as to ostensible agency precluded summary judgment. While Coldwell Banker "made no specific representations to appellant personally," it did, however, "make representations to the public in general upon which appellant relied," such as that it "'stood behind'" the broker's company. (*Id*. at p. 747.) Moreover, the broker's approved use of the venerable Coldwell Banker name and logo, the advertising campaign, and description of the franchise as a "member" caused plaintiff to belief he was dealing with the broker as Coldwell Banker's agent, and raised a factual issue as to whether an "ordinary reasonable person" might rely on the same belief. (*Kaplan, supra*, at p. 748.)

Similarly, here, plaintiffs allege that materials mailed by defendants to borrowers touted KGV as its "carefully selected" and "carefully screened" "business partner" and referred further questions regarding the loan application to "KGV Investments Inc. dba Countywide Financial." These materials also urged plaintiffs not to opt out of sharing their personal information with these "carefully screened business partners," so that Countrywide could provide plaintiffs with "valuable product and service offerings" from those partners to "help you accomplish your homeownership and other financial goals." Plaintiffs further allege that defendants knew of, and tacitly approved Vahedi's continued

12

use of the name "Countywide Financial," which furthered the association between Vahedi and the Countrywide brand. These allegations are sufficient to establish ostensible agency at the pleading stage. Defendants assert that plaintiffs' reliance on such statements was unreasonable and that the Ponzi scheme was outside the scope of any ostensible agency. While we recognize the problems articulated by defendants, they concern matters of evidentiary proof that cannot be resolved as a matter of law. Thus, we conclude plaintiffs have alleged sufficient factual detail in the SAC to plead Vahedi's ostensible agency.

### C. *Causation*

In their challenge to plaintiffs' ability to establish causation for their claims, defendants argue that plaintiffs' injuries were caused by their decision to invest in Vahedi's Ponzi scheme and that no conduct by defendants had a material effect on that decision. While acknowledging that causation is "typically a fact question," defendants suggest we may reach it here because the alleged facts "permit only one reasonable conclusion." (*Milligan v. Golden Gate Bridge Highway and Transp. Dist.* (2004) 120 Cal.App.4th 1, 9.) We disagree.

It is true that plaintiffs may face difficulty proving that any conduct by defendants caused their injuries, particularly given the apparent timing of the "business partner" letters after at least some plaintiffs already had decided to invest and in light of the extraordinary efforts Vahedi made to groom his victims and convince them of his wealth and his good intentions. However, the borrower plaintiffs have alleged harm through both mortgage fraud and the Ponzi scheme, and contend that conduct by defendants— both in promoting Vahedi and in failing to follow proper procedures to supervise both Vahedi and the loan underwriting process—was a substantial factor in causing their injuries. These allegations are sufficiently pled to overcome demurrer on this issue.

### III. Statute of Limitations

The trial court also sustained defendants' demurrers on the grounds that plaintiffs' claims were barred by the applicable statutes of limitations. The statutes of limitations for this case range from two to four years. (See Code Civ. Proc. §§ 337 [breach of

13

written contract, four years][7], 338, subd. (a) [unfair business practices pursuant to False Advertising Law, three years], 338, subd. (d) [fraud, three years]; Bus. & Prof. Code § 17208 [unfair business practices pursuant to Unfair Competition Law, four years]; *Thomson v. Canyon* (2011) 198 Cal.App.4th 594, 606-607 [fraudulent breach of fiduciary duty, three years; non-fraudulent breach of fiduciary duty, four years under § 343]; *Ventura Cty. Nat'l Bank v. Macker* (1996) 49 Cal.App.4th 1528, 1529-1531 [negligence and negligent misrepresentation, two years]; Welf. & Inst. Code § 15657.8 [financial abuse of elder or dependent adult, four years].)

The starting point for the running of a limitations period is the date of the "accrual of the cause of action." (*Fox v. Ethicon Endo–Surgery, Inc*. (2005) 35 Cal.4th 797, 806 (*Fox*).) As a general rule, the accrual date of a cause of action is "'when the cause of action is complete with all of its elements.'" (*Ibid*.) Plaintiffs do not dispute that they had incurred injuries as of 2008—at that point, all of them had made their investments in Vahedi's Ponzi scheme, and the mortgage loans issued to the borrower plaintiffs had closed. But they argue that their claims did not accrue until much later based on delayed discovery. They also assert fraudulent concealment by defendants, class action tolling and tolling under the last overt act doctrine, each discussed below, as bases for tolling the statute of limitations. In addition, although plaintiffs did not file their state complaint until 2014, they argue that the applicable filing date for statute of limitations purposes is October 10, 2012, the date they filed their federal lawsuit. Defendants do not dispute the application of this date. The trial court did not find that plaintiffs' claims against defendants were tolled based on the federal lawsuit, but did so with respect to individual defendant John Park, with no explanation as to this discrepancy. We agree that the limitations period is subject to equitable tolling where, as here, "'an injured person has several legal remedies and, reasonably and in good faith, pursues one.' [Citation.]" (*McDonald v. Antelope Valley Community College Dist*. (2008) 45 Cal.4th 88, 100; see also *Addison v. State of Calif.* (1978) 21 Cal.3d 313, 319.) Thus, for the plaintiffs who

---

[7] All further statutory references are to the Code of Civil Procedure unless stated otherwise.

14

first pursued their claims against defendants in federal court,[8] the statutes of limitations are tolled during the pendency of that action, beginning October 10, 2012.

### A.     *Delayed Discovery/Fraudulent Concealment*

Although their claims would have otherwise accrued in 2008 or earlier, plaintiffs contend they did not discover them until 2012, and therefore invoke the rule of delayed discovery to avoid the limitations bar.  "An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action.  [Citation.]"  (*Fox, supra,* 35 Cal.4th at p. 807.)  "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'  [Citations.]"  (*Ibid.*; see also *Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 897 ["the uniform California rule is that a limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the facts essential to his claim"].)

In order to rely on the discovery rule, "'[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.'  [Citation.]"  (*Fox, supra,* 35 Cal.4th at p. 808.)  In assessing allegations of delayed discovery, the court places the burden on plaintiff to allege facts showing diligence; conclusory allegations will not withstand demurrer.  (*Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 638.)

By their allegations in the SAC, plaintiffs admit—some expressly, some implicitly—that Vahedi's Ponzi scheme began to implode in late 2008, that Vahedi continued to make some months of payments on their investments but stopped no later than early 2009, and that he also sent "lulling" emails with explanations for nonpayment that ended in early to mid-2009.  They also acknowledge that some of the Ponzi victims realized the fraudulent nature of the scheme within a few months after the payments

---

[8] This tolling does not apply to the Fergusons, the only plaintiffs here who were not also parties to the federal lawsuit.

15

ended. For example, the Gomezes allege that Vahedi made "all his payments as promised" on their Ponzi loan until late 2008. They also detailed numerous emails sent by Vahedi in late 2008, blaming "bank errors" and offering other excuses for missed payments. Then, by "March 12, 2009, due to his nonpayment and recent failures to communicate, the Gomezes concluded that they had been harmed" by Vahedi. The remaining borrower plaintiffs allege similar facts of lulling and discovery.

Despite these facts, plaintiffs contend they did not discover their causes of action against defendants until 2012, when they learned of defendants' involvement in the scheme from their attorney. Thus, although they knew of Vahedi's orchestration of the Ponzi scheme by mid-2009, plaintiffs allege that they could not have discovered defendants' participation in the mortgage fraud or the Ponzi scheme at that time, because they did not have access to their loan documents, were not aware of the misrepresentations in those documents, and did not suspect that the Ponzi scheme extended beyond Vahedi.

We are not persuaded, for several reasons. First, with respect to the Ponzi aspect of the scheme, knowledge of defendants' precise identity or role is not required to trigger accrual of plaintiffs' claims. Rather, the discovery rule "only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action;" on the other hand, the fact that plaintiff does not have reason to suspect the defendant's identity is generally insufficient to invoke delayed discovery. (*Fox, supra,* 35 Cal.4th at p. 807.) In other words, "'the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her.'" (*Bernson v. Browning-Ferris Indus. of Calif., Inc.* (1994) 7 Cal.4th 926, 932; see also *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397-398 ["'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding'"]; *Knowles v. Sup.Ct. (Labo)* (2004) 118 Cal.App.4th 1290, 1299-1300 ["When a plaintiff has cause to sue based on knowledge or suspicion of negligence the statute starts to run as to all potential defendants."].) Thus, once plaintiffs were aware of their injuries as a result of the fraudulent Ponzi scheme, the statutes of limitations on those claims began to

16

run as to both Vahedi and defendants. This is particularly appropriate on these facts, given that plaintiffs have alleged that they relied on the connection between defendants and Vahedi in deciding both to make their Ponzi investments and to take out mortgage loans. Having done so, they cannot reasonably claim they were not, at a minimum, on inquiry notice as to defendants' potential role in the resulting harm.

Second, with respect to the mortgage loans, plaintiffs deliberately link the "inextricably intertwined" mortgage loan and Ponzi loan aspects of the alleged scheme in order to trigger delayed discovery of the problems with their mortgage loans. Specifically, plaintiffs assert they were unaware that their loans were unaffordable and contained other unfavorable terms at the time the loans closed, or even when payments began, because Vahedi's promised repayment installments on the Ponzi loans obscured the defects with the mortgage loans. Therefore, at the latest, once Vahedi's lulling payments ceased in late 2008 or early 2009, plaintiffs were on notice that their loans were actually unaffordable. And while they allege that some plaintiffs requested their loan files from defendants starting in 2012, there are no allegations in the SAC explaining why they did not request those documents in 2009, or why they could not have done so. Their allegations therefore fall short of establishing delayed discovery past mid-2009.[9]

Putting these pieces together, we conclude that plaintiffs adequately alleged delayed discovery until mid-2009, at the latest. Because the Fergusons did not file their

---

[9] We reject, however, defendants' assertion that plaintiffs must have, or should have, been aware of these schemes by 2008 at the latest. This assertion is unsupported by the SAC, which specifically alleges lulling payments and emails through mid-2009, as detailed herein, and ignores the trial court's finding that "Vahedi stopped making payments on the Ponzi scheme between 9/14/2008 and 1/16/2009." Defendants contend that by September 2008, plaintiffs alleged they had received "hundreds" of lulling emails from Vahedi and therefore at this point plaintiffs could not reasonably remain free of suspicion. We disagree. Defendants misstate the allegations of individual plaintiffs, many of whom only began receiving lulling emails in lieu of payments in the second half of 2008 as well as the applicable case law. (See *Brownlee v. Vang* (1965) 235 Cal.App.2d 465, 477 [finding plaintiff justifiably relied on defendant based on lulling statements made for eight years].)

claims until 2014, more than four years later, all of their claims are barred.[10]  The other borrower plaintiffs filed their federal lawsuit in October 2012, more than three years after their claims accrued in mid-2009.  Therefore, their claims with two and three year limitations periods are barred, unless the statutes of limitations are tolled, as addressed below.  However, these plaintiffs have adequately alleged that their claims with four year statutes of limitations—namely the claims for unfair business practices, non-fraudulent breach of fiduciary duty, breach of contract, and elder and dependent adult abuse—were filed within the applicable limitations period.  The trial court erred in sustaining defendants' demurrer as to these four claims on this basis.

**B.** *Fraudulent Concealment*

In addition, plaintiffs suggest that defendants' alleged role in fraudulently concealing their wrongdoing, principally by refusing to produce the complete loan files upon request, operates to toll the limitations period.  The purpose of allowing tolling based on fraudulent concealment is "to disarm a defendant who, by his own deception, has caused a claim to become stale and a plaintiff dilatory." (*Regents of Univ. of Calif. v. Sup.Ct. (Molloy)* (1999) 20 Cal.4th 509, 533.)  However, the alleged misconduct by defendants occurred in 2012, when plaintiffs requested their loan files.  By then, plaintiffs had been on inquiry notice, if not actual notice, of their claims for three years and cannot allege reasonable reliance on any concealment by defendants at that late date.  (See *Grisham v. Philip Morris U.S.A., Inc., supra,* 40 Cal.4th at pp. 637-638 ["A defendant's fraud in concealing a cause of action against him [or her] will toll the statute of limitations, and that tolling will last as long as a plaintiff's reliance on the misrepresentation is reasonable."].)

---

[10] With respect to the Bartecks, they allege they are "former customers" of Countrywide, who took out a mortgage loan with defendants in 2007, but did not use the proceeds from that loan as the source of their investment with Vahedi.  They offer no explanation for why they were not on notice as to any deficiencies with their mortgage loan once repayment began.  Their claims related to mortgage fraud are therefore time-barred.  Their claims related to the Ponzi aspect of the scheme, once un-moored from the mortgage fraud aspect, lack sufficient connection to defendants, as with the non-borrower plaintiffs.

18

## C. *Class Action Tolling*

Plaintiffs also argue that five class action complaints filed by unrelated borrowers against defendants regarding their underwriting and lending practices operate to toll the statutes of limitations here. To do so, plaintiffs invoke the tolling rule under *American Pipe & Construction Co. v. Utah* (1974) 414 U.S. 538, 554 and its progeny that, in certain circumstances, the filing of a class action complaint tolls the running of the statute of limitations for all members of the purported class until class action certification is denied. As limited by the California Supreme Court in *Jolly v. Eli Lilly & Co*. (1988) 44 Cal.3d 1103, 1121 (*Jolly*), this rule recognizes two competing policy considerations: first, "protection of the class action device," and second, "effectuation of the purposes of the statute of limitations." (*Jolly, supra*, 44 Cal.3d at p. 1121.) Under the latter consideration, "[t]he policies of ensuring essential fairness to defendants and of barring a plaintiff who has 'slept on his rights,' . . . are satisfied" when the class action complaint "notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." (*Ibid*. [quoting *American Pipe, supra*, 414 U.S. at pp. 554-555].) Accordingly, the *Jolly* court concluded that tolling did not apply, because the differences in the nature of the class claims from the "gravamen of plaintiff's complaint," and in factual and legal issues (including those "involved in proving causation, damages and defenses") meant the class suit "could not have apprised defendants of plaintiff's substantive claims. Therefore, plaintiff cannot now claim that [the class] complaint put defendants on notice of allegations related to personal injury within the statutory period of limitation so that they might prepare their defense." (*Id*. at pp. 1123-1124.)

Following *Jolly*, California courts have limited the application of this rule to instances "where the class action and the later individual action . . . are based on the same claims and subject matter and similar evidence." (*Perkin v. San Diego Gas & Electric Company* (2014) 225 Cal.App.4th 492, 504; see also *Becker v. McMillin Construction Co.* (1991) 226 Cal.App.3d 1493, 1499, 1501 [limitations statute tolled for purported class member "where the class action and the later individual action or intervention are

19

based on the same claims and subject matter and similar evidence" provided notice]; accord *Crown, Cork & Seal Co. v. Parker* (1983) 462 U.S. 345, 354-355, (conc. opn. by Blackmun, J.) ["The rule should not be read . . . as leaving a plaintiff free to raise different or peripheral claims following denial of class status. [¶] . . . [T]he [] court should take care to ensure that the [later individual] suit raises claims that 'concern the same evidence, memories, and witnesses as the subject matter of the original class suit,' so that 'the defendant will not be prejudiced.'"] (Quoting *American Pipe, supra*, 414 U.S. at p. 562).)

Here, plaintiffs point to five "nationwide borrower-class action" complaints filed against defendants between 2007 and 2009, ultimately consolidated under a master class complaint. According to plaintiffs, these class actions named a putative class of Countrywide borrowers and alleged unfair competition and fraud claims related to a scheme between defendants and their network of mortgage brokers to "steer[] borrowers into subprime loans in order to maximize the profits [they] would earn from the securitization of these loans."

Crucially, plaintiffs concede that none of these class action cases involved claims related to Vahedi's Ponzi scheme, or any other broker Ponzi scheme. Nevertheless, they argue that tolling should apply because the borrower plaintiffs are putative class members and the allegations "overlap" with the class actions to the extent they involve misdeeds by brokers and defendants in putting borrowers into risky, unaffordable loans. Plaintiffs' argument ignores the requirements of *Jolly* and subsequent cases, as cited by both the trial court and defendants here, that the cases involve the "same" claims and subject matter; instead, plaintiffs suggest without support that cases with merely "similar" claims and "overlapping" allegations may invoke tolling. We are not persuaded. The focus of plaintiffs' complaint involves an alleged scheme between defendants and Vahedi to convince plaintiffs to invest with Vahedi and to raise the seed money for that investment through unfavorable mortgage loans. Nothing in the class action allegations identified by

20

plaintiffs could have put defendants on notice of this purported scheme. Under these circumstances, we agree with the trial court that class action tolling does not apply.[11]

Having rejected plaintiffs' tolling arguments, we conclude that six of the borrower plaintiffs—the Gomezes, Alvandi, Raft, and the Markses—have sufficiently alleged facts to support delayed discovery of their claims for unfair business practices, non-fraudulent breach of fiduciary duty, elder and dependent adult abuse (as to the Markses) and breach of contract. The remaining claims are time barred.

## IV.     Adequacy of Remaining Causes of Action

Finally, we turn to individual analyses of the four remaining causes of action. While we agree with the trial court that plaintiffs' breach of contract claim fails, we conclude the claims for unfair business practices, non-fraudulent breach of fiduciary duty, and elder or dependent adult abuse are sufficiently pled.

### A.     *Unfair business practices*

Plaintiffs' second cause of action alleges both violations of the Unfair Competition Law (UCL), Business & Professions Code section 17200, and the False Advertising Law (FAL), Business & Professions Code section 17500. However, the FAL claim is time barred, as noted above. Thus, we examine only plaintiffs' allegations related to their UCL claim.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code § 17200.) The "unlawful" prong borrows violations of other laws and treats them as "'unlawful practices'" independently actionable under the UCL. (*Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.* (1999) 20 Cal.4th 163, 180.) "'Virtually any law—federal, state or local—can serve as a predicate for an action under

---

[11] Plaintiffs also rely on *Wyatt, supra,* 24 Cal.3d at p. 786 for the proposition that "when a civil conspiracy is properly alleged and proved, the statute of limitations does not begin to run on any part of a plaintiff's claims until the 'last overt act' pursuant to the conspiracy has been completed. [Citation.]" But this doctrine does not aid plaintiffs here, as we conclude they have not adequately pled the existence of a conspiracy. Accordingly, plaintiffs cannot assert the last overt act doctrine in order to toll the statutes of limitations on their claims.

21

Business and Professions Code section 17200. [Citation.]'" (*Ticconi v. Blue Shield of California Life & Health Ins. Co*. (2008) 160 Cal.App.4th 528, 539.)

Plaintiffs allege that defendants are liable under the UCL in two ways: first, under an agency theory, for Vahedi's undisputed violations of the law while engaging in both the fraudulent mortgage loan and the Ponzi portions of the scheme; and second, for defendants' own conduct in connection with those schemes. In a two paragraph response in their appellate brief, defendants do not challenge the availability of agency liability to a UCL claim (although they generally challenge agency, as previously discussed). Instead, they simply contend that even if they had violated the UCL in the manner alleged, those violations would be "immaterial," because they did not cause plaintiffs' injuries.

We conclude that plaintiffs have adequately pled their UCL claim under either theory. First, we previously concluded that the SAC contained sufficient allegations to proceed on a claim of liability based on ostensible agency. Given that conclusion, plaintiffs may base their UCL claim on allegations that Vahedi, as defendants' agent, violated numerous laws by preparing and submitting fraudulent mortgage loan applications, failing to make required disclosures to plaintiffs regarding those applications, and taking money from plaintiffs with the intent to defraud them in the Ponzi scheme. (See *People v. JTH Tax, Inc*. (2013) 212 Cal.App.4th 1219, 1242 [holding that "persons can be found liable for misleading advertising and unfair business practices under normal agency theory"]; cf. *People v. Toomey* (1984) 157 Cal.App.3d 1, 15 [permitting UCL liability based on evidence of "defendant's participation in the unlawful practices, either directly or by aiding and abetting the principal," or through a conspiracy, but finding that the "concept of vicarious liability has no application" to UCL actions].) Second, as with defendants' general arguments regarding causation, their challenge to the materiality of defendants' alleged violations presents a question of fact that we cannot resolve in demurrer. (See, e.g., *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1235.) Accordingly, we reverse the trial court's order sustaining defendants' demurrer as to the UCL claim.

22

**B.** *Non-fraudulent breach of fiduciary duty*

In their third cause of action, plaintiffs allege "breach, conspiracy to breach, and aiding and abetting breach of fiduciary duty and constructive fraud arising from breach of fiduciary duty." The parties do not dispute that Vahedi owed fiduciary duties to the borrower plaintiffs as a mortgage broker and that he breached those duties in numerous ways.[12] Plaintiffs contend that defendants are liable for Vahedi's breaches based on agency, conspiracy, and aiding and abetting theories. In addition, they allege that defendants stepped out of a traditional role of a lender and assumed the duties of a mortgage broker, thereby triggering their own fiduciary duties to plaintiffs and subsequently breaching those duties. Defendants focus on the fact that traditional lenders under California law owe no fiduciary duties to borrowers. (See, e.g., *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 ["[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money. [Citations]"].) They assert that defendants could not have operated as a mortgage broker under the applicable law.

Whether a fiduciary relationship exists in any given situation is a question of fact. (*Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1575-1576.) While defendants urge us to find as a matter of law that they could not have acted as mortgage brokers here, we need not reach this issue. Plaintiffs have alleged that Vahedi breached his fiduciary duties (see, e.g., *Wyatt, supra*, 24 Cal.3d at pp. 782-783 [mortgage broker breaches fiduciary duties by providing "materially misleading and incomplete information" regarding the terms of a loan even if the correct terms are in the loan documents]) and that defendants are liable for those breaches based on the principal/agent relationship between defendants and Vahedi (see *Kaplan, supra*, 59 Cal.App.4th at pp. 744, 747 [allowing plaintiffs' claims against principal for broker's acts of fraud, misrepresentation

---

[12] Although the parties did not address it, we note that the breadth of Vahedi's alleged conduct would likely encompass both fraudulent and non-fraudulent breaches. Only the latter type avoid the statute of limitations bar.

and breach of fiduciary duty, where plaintiffs presented triable issue of fact as to ostensible agency between broker and principal]).  These allegations are sufficient to plead a claim for breach of fiduciary duty.

### C.    *Elder and dependent adult abuse*

We next examine the sixth cause of action brought by the Markses for abuse under the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.) (the Act).  This statute was enacted to protect elderly and dependent adults from various forms of abuse, including financial abuse.  (Welf. & Inst. Code, §§ 15600, 15610.07.)  Douglas Marks alleges that he is "partially disabled by physical limitations in his normal activities of walking" and therefore seeks relief as a dependent adult under the abuse act.[13]

The Act was substantively amended effective January 2009.  (See *Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 736-737 (*Das*) [substantive 2008 amendments to the Act were not retroactive in effect].)  As effective during the time period covering the Markses' mortgage application and Ponzi loan to Vahedi (2007), section 15610.30 provided:  "(a) 'Financial abuse' of an elder or dependent adult occurs when a person or entity does any of the following:  [¶]  (1) Takes, secretes, appropriates, or retains real or personal property of an elder or dependent adult to [sic] a wrongful use or with intent to defraud, or both.  [¶] (2) Assists in taking, secreting, appropriating, or retaining real or personal property of an elder or dependent adult to [sic] a wrongful use or with intent to defraud, or both.  [¶] (b) A person or entity shall be deemed to have taken, secreted, appropriated, or retained property for a wrongful use if, among other

---

[13] "Dependent adult" is defined as "any person between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities, or whose physical or mental abilities have diminished because of age." (Welf. & Inst.Code § 15610.23, subd. (a).)  The parties have not raised on appeal the issue of whether Douglas Marks qualifies as a "dependent adult" under this section.  We therefore do not reach this issue.

24

things, the person or entity takes, secretes, appropriates or retains possession of property in bad faith." (See *Das, supra,* 186 Cal.App.4th at p. 736-737.)

On appeal, the parties dispute the extent of knowledge required to trigger liability under the Act, particularly with respect to the Ponzi scheme. The amended version of this section replaced the "bad faith" element in subdivision (b) with the requirement that the actor "knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." (Welf. & Inst. Code, § 15610.30, subd. (b).) Plaintiffs rely on the later version but raise no argument suggesting why it would be applicable here, when the alleged events at issue occurred prior to 2009. Although defendants correctly cite *Das, supra,* 186 Cal.App.4th at p. 745, in support of the proposition that acts of *assistance* by defendants require a showing of actual knowledge, neither party addresses the statutory amendment or the "bad faith" requirement under the prior version.

We need not resolve this issue, however, because we conclude that the Markses have adequately stated a claim for dependent adult abuse based on alleged direct conduct by defendants. Specifically, plaintiffs allege that defendants wrongfully retained "excessive fees and interest" paid by plaintiffs on their "toxic" mortgages, that these payments were higher than defendants would have charged on an affordable loan, and that defendants purposefully accepted fraudulent mortgage applications and issued inflated loan amounts in order to gain these fees. These allegations are sufficient to plead that defendants committed a "taking" of the Markses' property within the meaning of the Act as it existed prior to 2009. (See, e.g., *Wood v. Jamison* (2008) 167 Cal.App.4th 156, 164-165 [elder's attorney engaged in financial abuse by improperly accepting as fee certain funds to which elder was entitled through loan]; *Zimmer v. Nawabi* (E.D. Cal. 2008) 566 F.Supp.2d 1025, 1034 [allowing elder abuse claim based on receipt of fees which broker "wrongfully obtained as a result of [its employee's] false statements about the terms of plaintiff's refinance, which it knew were less favorable to plaintiff than her previous mortgage"].)

**D.** *Breach of contract*

Plaintiffs' seventh cause of action alleges breach of contract by Countrywide Bank. Specifically, plaintiffs allege they entered into a "written Home Equity Confirmation Agreement" (the agreement) as part of the mortgage loan process and attach a copy of the document to the SAC as an exhibit. The paragraph at issue, paragraph 11, provides: "The Lender estimates that it will take approximately 30 days to process, approve, close and fund the loan. . . . However, this Agreement is not a commitment to close and fund the loan prior to the expiration date. . . . The Lender agrees to exercise reasonable efforts to obtain third-party documentation. . . ." Plaintiffs contend that this language created an obligation for defendants "to obtain third-party [verification] of [Plaintiffs'] income and employment" prior to funding the loan, and that defendants breached this obligation by failing to submit forms to the Internal Revenue Service (IRS) requesting such verification.

Defendants argue, and the trial court found, that plaintiffs failed to adequately plead any breach by defendants of the cited contractual provision. We agree. We may consider the truth of any documents attached to the complaint, and if they contradict factual allegations in the complaint, we give the documents credence. (*Dodd v. Citizens Bank of Costa Mesa* (1990) 222 Cal.App.3d 1624, 1627.) Contrary to plaintiffs' claims, the contract does not contain any promises by Countrywide Bank to obtain certain documentation, or to do so prior to closing or funding the loan. Nor do plaintiffs allege any other conduct by defendants that breached the contract, apart from failing to submit the verification forms to the IRS. As such, plaintiffs have not alleged any conduct by defendants that breached the agreement. We therefore affirm the trial court's order sustaining the demurrer as to this cause of action.

**E.** *Leave to amend*

Finally, we note that plaintiffs have not attempted to explain how they could amend to correct any deficiencies outlined by the trial court and herein. As such, for the causes of action we have found to be properly dismissed, we conclude the trial court did not err in doing so without further leave to amend.

26

## DISPOSITION

We reverse the trial court's order on the demurrer as to the second cause of action for unfair business practices and the third cause of action for non-fraudulent breach of fiduciary duty, as to plaintiffs Maria and Elias Gomez, Vachik Alvandi, Evelin Raft, and Douglas and Sharon Marks, and the sixth cause of action for dependent adult abuse as to plaintiffs Douglas and Sharon Marks.  In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

27